

**SO ORDERED.**

**SIGNED this 15 day of January, 2010.**

_____
**Catharine R. Carruthers
United States Bankruptcy Judge**
_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| D & M Land Company, LLC, | ) | Case No. 07-00054 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER came on before the court on January 5, 2010, after due and proper notice, upon the Motion by Debtor for Final Decree and the Response by Branch Banking and Trust Company in Opposition to Final Decree and Motion for Order Requiring Disgorgement and Turnover of Attorneys' Fees. Stephani W. Humrickhouse, Gregory B. Crampton, and Kevin L. Sink appeared on behalf of the Debtor, and Daniel C. Bruton appeared on behalf of Branch Banking and Trust Company ("BB&T"). After consideration of the arguments of counsel, the evidence presented and other matters of record, the court finds as follows:

**1.  Background Facts**

The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on January 10, 2007 (the "Petition Date"). On March 1, 2007, the Court entered an order authorizing the employment

of the law firm of Nicholls & Crampton, P.A. ("Nicholls & Crampton") as counsel for the Debtor. The Debtor's sole asset was a vacant building on a parcel of real property located at 10701 Glenwood Avenue in Raleigh, North Carolina (the "Real Property"), which the Debtor listed on Schedule A with a value of $6,500,000.00. On the Petition Date, BB&T was a creditor secured by a first deed of trust (the "Deed of Trust") on the Real Property with a claim in the amount of $5,154,612.32. The Deed of Trust included an assignment of rents and profits from the Real Property as additional security. BB&T was further secured by a duly perfected security interest in the Debtor's inventory, equipment, and general intangibles.

Prior to the Petition Date, in September 2006, the Debtor entered into an Agreement for the Purchase and Sale of Real Property (the "Original Contract") with Zion Temple United Church of Christ ("Zion Temple") whereby the Debtor agreed to sell and Zion Temple agreed to purchase the Real Property for $6,500,000.00. Zion Temple deposited the amount of $65,000.00 as an earnest money deposit under the Original Contract. The Original Contract provided that "[a]ll Earnest Money deposited will be non-refundable 45 days after date of contract, but will become part of the purchase price." It also provided as follows:

> In the event this offer is accepted and Buyer breaches this Agreement, then the Earnest Money shall be forfeited, but such forfeiture shall not affect any other remedies available to Seller for such breach.

The closing date for the transaction was on or before January 18, 2007. Zion Temple failed to purchase the Real Property by the closing date. The Debtor contends that on the Petition Date, the parties disputed whether Zion Temple was entitled to the return of the earnest money deposit as the Original Contract did not provide for an exception relating to a lease and easement for a cellular phone tower on the Real Property.

Subsequent to the Petition Date, the Debtor and Zion Temple entered into an Amended and Restated Contract of Purchase and Sale dated May 9, 2007 (the "Amended and Restated Contract"), which contained certain new terms and conditions upon which the Debtor agreed to sell and Zion Temple agreed to purchase the Real Property.  The Amended and Restated Contract provided for an earnest money deposit consisting of (1) $65,000.00, which the contract indicated represented the earnest money under the Original Contract, and (2) an additional $5,000.00.  The Amended and Restated Contract also provided that "the Earnest Money Deposit shall be paid to Seller as full liquidated damages and as Seller's sole and exclusive remedy for any breach by Buyer of this Contract...."

The Debtor contends that the Amended and Restated Contract superceded, rather than amended, the Original Contract, and that the earnest money deposit under the Original Contract was essentially being returned to Zion Temple and then utilized as a new earnest money deposit for the Amended and Restated Contract.  Notwithstanding, in paragraph 5 of the Amended and Restated Contract, Zion Temple specifically acknowledged and agreed that the Debtor had "performed all of its obligations under the [Original] Contract."  The Debtor claims this provision, which was drafted by counsel for the Debtor, was simply intended to ensure that Zion Temple asserted no future claims against the Debtor for breach of the Original Contract. Pursuant to the Amended and Restated Contract, the closing date for the transaction was July 10, 2007, and Zion Temple had the right to two extensions of the closing date upon the payment of extension fees in the amount of $22,500.00 each.  Zion Temple exercised its right to both extensions such that the closing date was extended through September 10, 2007.

Zion Temple did not close by the second extended closing date provided for in the Amended

and Restated Contract. As of September 10, 2007, Zion Temple acknowledged the Debtor's entitlement to $116,499.91 being held by Graham Realty Inc., the escrow agent, consisting of (1) the earnest money in the amount of $65,000.00, (2) post-petition deposits in the amount of $50,000.00, and (3) interest of $1,499.91. Zion Temple acknowledged the Debtor's entitlement to such funds and authorized the release of such funds from Graham Realty, Inc. to the Debtor.

On October 31, 2007, the Debtor and Zion Temple executed a First Amendment to the Amended and Restated Contract of Purchase and Sale ("First Amendment"). Pursuant to the First Amendment, Zion Temple confirmed that it did not have any rights in the forfeited amount of $116,499.91, except the right to receive a credit in the event it purchased the Real Property. Zion Temple also paid to the Debtor an additional fully earned non-refundable extension fee in the amount of $67,500.00. Zion Temple had until December 5, 2007 to close on the purchase of the Real Property but failed to do so. In total, the Debtor collected and retained $183,999.91 from Zion Temple in connection with a sale agreement that never closed.

On November 9, 2007, the Debtor filed a Motion for Use of Cash Collateral or in the Alternative, Motion for Recovery of Administrative Expenses from Collateral of BB&T pursuant to 11 U.S.C. § 506(c), requesting authority to use a portion of the $183,991.91 from Zion Temple to pay $172,220.95 in legal fees and expenses owing to counsel for the Debtor. On November 21, 2007, BB&T filed a response asserting that the earnest money deposit under the Original Contract in the amount of $65,000.00 was subject to the perfected security interest of BB&T. BB&T argued that the earnest money deposit was a general intangible which was covered under BB&T's security agreement. On December 6, 2007, the Court entered an order permitting the Debtor to pay the $172,220.95 to Nicholls & Crampton, noting that the likely value of the Real Property would be

4

sufficient to pay BB&T's claim in full. The order found that the Original Contract had been amended post-petition. The order further provided that in the event there was insufficient value in the Real Property to pay BB&T's claim in full, and BB&T's security interest was determined to be valid, Nicholls & Crampton might have to return the earnest money paid to it for the benefit of BB&T.

During this same general time period the Debtor received an offer to purchase the Real Property from another interested party, Southbridge Fellowship. On November 27, 2007, the Debtor filed a motion to sell the Raleigh Facility to Southbridge Fellowship for $6,300,000.00 in the event that Zion Temple failed to consummate its purchase of the Real Property. This motion was granted; however, Southbridge Fellowship also failed to close on the Real Property and forfeited $30,000.00 of its earnest money deposit.

The Debtor's Chapter 11 plan, confirmed on December 19, 2007, provided as follows:

> BB&T shall retain its first deed of trust interest on Debtor's real property as described in that Deed of Trust referenced in Paragraph 4.4 herein. BB&T asserts that it holds a perfected security interest in Debtor's general intangibles, and that said security interest covers $65,000 of monies received by the Debtor as earnest money relating to the sale of Debtor's real estate (said $65,000 amount is hereinafter referred to as the "Disputed Escrow Funds"). The Debtor disputes BB&T's secured claim in the Disputed Escrow Funds. BB&T shall retain its security interest in Debtor's general intangibles to the extent the same existed on the Petition Date, and to the extent any such security interest was valid and enforceable post-petition. In the event the validity of BB&T's asserted security interest in the Disputed Escrow Funds becomes a pertinent issue post-confirmation, the Court shall determine the issue. Debtor retains its right to contest BB&T's asserted security interest in the Disputed Escrow Funds, including the right to seek recovery from BB&T pursuant to 11 U.S.C. §506(c) of necessary costs and expenses of preserving and disposing of Debtor's real property from, and limited to the extent of, any allowed BB&T security interest in the Disputed Escrow Funds.

The confirmed plan provided for a public auction of the Real Property in the event that it

had not yet been sold during a marketing period ending on September 15, 2008. On November 24, 2008, BB&T filed a Motion for Order Modifying Plan or in the alternative, for an Order in Aid of Consummation of Plan requesting that the court enter an order eliminating the public auction process, thereby eliminating auctioneer expenses, and authorizing all secured creditors to enforce their liens pursuant to the terms of their loan documents and applicable nonbankruptcy law. The Debtor opposed BB&T's motion, and the court entered an order denying the motion on January 9, 2009. The Real Property was auctioned and sold to BB&T with a credit bid in the amount of $4,200,000.00. As required by the order allowing the sale of the Real Property and the confirmed plan, BB&T paid for the costs of the auction, including the auctioneer commission of $169,500.00 and the Debtor's related attorney fees and expenses in the amount $14,255.37.

In sum, the Debtor received a total of $213,999.91 in forfeited earnest money deposits, $65,000.00 of which stems from the Original Contract. From the Petition Date through March 2009 when the Real Property was auctioned, a period of over two years, the Debtor received rental income of $1,150.00 per month for the cellular phone tower lease on the Real Property. The rental income received prior to confirmation is reflected on the Debtor's monthly reports, and counsel for the Debtor represented to the court that the Debtor continued to receive those payments post-confirmation until the end of March 2009. The Debtor utilized this income to pay utilities and insurance for the Real Property.

**2. Is the $65,000.00 earnest money deposit BB&T's collateral?**

BB&T asserts that the $65,000.00 that Zion Temple paid as an earnest money deposit pursuant to the Original Contract constitutes proceeds of the Real Property and that BB&T has a

security interest in such proceeds under the Deed of Trust. As BB&T has an unpaid deficiency claim in this case in excess of $1,000,000.00, it argues that this court should require the disgorgement and turnover of the $65,000.00 earnest money deposit to BB&T. In response, the Debtor contends that BB&T's rights are defined by the confirmed Chapter 11 plan and that the plan only preserved BB&T's right to assert a security interest in the earnest money deposit as a general intangible. The Debtor asserts that any security interest BB&T may have had in the earnest money deposit by virtue of the Deed of Trust was eliminated upon confirmation of the plan. In the alternative, the Debtor contends that BB&T should be estopped from asserting its security interest under the Deed of Trust as the Debtor relied on BB&T's original assertion that the earnest money deposit was a general intangible.

      The court does not find the Debtor's arguments persuasive. The Chapter 11 plan provides both that (1) "BB&T shall retain its first deed of trust interest on Debtor's real property..." and that (2) "BB&T shall retain its security interest in Debtor's general intangibles to the extent the same existed on the Petition Date, and to the extent any such security interest was valid and enforceable post-petition." The confirmed plan did not modify the scope BB&T's security interest under the Deed of Trust. Therefore, any security interest that BB&T had under the Deed of Trust on the Petition Date, which remained valid and enforceable post-petition, continues to be enforceable post-confirmation.

      Furthermore, after consideration of the facts and circumstances, the court cannot find estoppel is applicable here. Judicial estoppel is an equitable doctrine used "to prevent a party 'from playing 'fast and loose' with the courts, and to protect the essential integrity of the judicial process.'" *John S. Clark Co. v. Faggert & Frieden, P.C.,* 65 F.3d 26, 29 (4th Cir. 1995) (*quoting*

*Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1166 (4th Cir. 1982)). Judicial estoppel may be applicable when: (1) the party to be estopped advances an assertion that is inconsistent with a position taken during a previous proceeding; (2) the position is one of fact, rather than law or legal theory; (3) the prior position was accepted by the court in the first proceeding; and (4) the party to be estopped acted intentionally, not inadvertently. *Havird Oil Co. v. Marathon Oil Co.,* 149 F.3d 283, 292 (4th Cir.1998) (*citing Lowery v. Stovall,* 92 F.3d 219, 224 (4th Cir. 1996)). Here, BB&T has consistently asserted a security interest in the $65,000.00 earnest money deposit. The position that BB&T has changed is one of law, not one of fact. The court certainly did not accept BB&T's position, but rather, reserved the issue for a later date. While BB&T candidly admits it changed its legal theory, it certainly did not act intentionally. In fact, both parties admit that if BB&T had initially asserted the Deed of Trust theory, it could have argued that it held a security interest in all of the earnest money deposits. *See* 11 U.S.C. § 552(b)(1) ("Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law...").

Thus, the court must determine whether BB&T did indeed have a lien on the earnest money deposit by virtue of the Deed of Trust. In *Old Stone Bank v. Tycon,* 946 F.2d 271 (4th Cir. 1991), the Fourth Circuit addressed a case substantially similar to the present. In *Old Stone*,

the deed of trust provided the creditor with a lien on the debtor's real property including: (1) all rents, issues, and profits arising from the property in the event of the debtor's default; and (2) any additional right, title, or interest in the property that might be acquired by the debtor. *Id.* at 272. The debtor entered into a contract to sell the real property that provided for an earnest money deposit which would be applied to the purchase price upon closing. *Id.* at 275. The sale did not close, and the purchaser forfeited its earnest money deposit. *Id.* at 272. Subsequently, the creditor claimed that the earnest money deposit was proceeds of its collateral. The Fourth Circuit found that the deed of trust attached to any proceeds from the disposition of the real property, and that the earnest money constituted proceeds from the disposition of the real property. *Id.* at 276. In reaching its decision, the court found that while the Uniform Commercial Code did not govern the transaction, it was persuasive, and nothing in the language of the Uniform Commercial Code indicated that a sale must be finalized in order to generate proceeds. *Id.* at 274. In addition, the court looked to Virginia law, pursuant to which equitable title passes to the purchaser upon execution of a contract, as well as the broad language of the deed of trust and the "overall commercial realities at issue," noting that the debtor was a single asset entity with the real property being its only asset. *Id.* at 274-75. The court rejected the debtor's attempt to distinguish two decisions, *In re Aldersgate Foundation, Inc.*, 878 F.2d 1326 (11th Cir. 1989), and *In re Vandevender,* 87 B.R. 59 (Bankr. S.D. Ill.1988), which also found that a forfeited earnest money deposit should be classified as proceeds and found, instead, *Aldersgate* and *Vandevender* to be persuasive. *Id.* at 273.

      The parallels between the present case and *Old Stone* are numerous. The documents involved in the instant case have similar provisions as those in *Old Stone*. As in *Old Stone*, the

Deed of Trust contains broad language covering "real property... together with any improvements, equipment and fixtures existing or hereafter placed on or attached to this real property, all proceeds thereof and all other appurtenant rights and privileges" as well as an assignment of rents and profits. Also, as in *Old Stone*, the contract for sale provides for the earnest money deposit to be applied to the purchase price upon closing. The court further notes that the commercial realities are identical: the Debtor's sole asset was the Real Property. The Debtor argues that, notwithstanding the similarities, the Fourth Circuit's decision in *Old Stone* is limited in its application to Virginia law. The Debtor points to North Carolina law, specifically, Uniform Vendor and Purchaser Risk Act codified in N.C. Gen. Stat. § 39-36, *et seq.*, which provides that the risk of loss remains with the seller until legal title is transferred. As such, the Debtor argues that no equitable title passes to the purchaser upon execution of a contact, and no property rights are conveyed in a manner that would generate "proceeds."

While the Debtor's argument is not without merit, the court finds that the $65,000.00 earnest money deposit constitutes an interest in the Real Property subject BB&T's Deed of Trust and, therefore, is subject to BB&T's security interest. The court simply cannot find sufficient grounds on which to distinguish *Old Stone's* holding from the present case. The Fourth Circuit's holding is grounded on multiple considerations, not simply the equitable title analysis under Virginia law. Furthermore, other courts that have addressed this precise issue have reached a similar conclusion. *See In re Aldersgate Foundation, Inc.*, 878 F.2d 1326, 1328 (11th Cir. 1989); *In re Sissom,* 366 B.R. 677, 702 n.39 (Bankr. S.D. Tex. 2007); *In re Clancy & Co. Constr., Inc.,* 214 B.R. 387, 392 (Bankr. D.Colo.1997); *In re Vandevender,* 87 B.R. at 61.

In addition, the court notes that the Original Contract provided that the earnest money

deposit was to be applied to the purchase price upon closing. While providing for forfeiture, the Original Contract specifically reserved the Debtor's right to pursue other remedies. As such, under North Carolina law, the earnest money deposit did not serve as liquidated damages. *See Chris v. Epstein*, 113 N.C.App. 751, 757, 440, S.E.2d 581, 585 (1994). It is true that the Amended and Restated Contract does identify the earnest money deposit as liquidated damages; however, that provision could not modify any security interest that had already attached to the $65,000.00 under the Original Contract. While the Debtor contends that it was unable to perform the Original Contract and consequently, the first earnest money deposit was, in essence, returned to Zion Temple, the plain language of the Amended and Restated Contract indicates otherwise. *See Corbin v. Langdon*, 23 N.C.App. 21, 25, 208 S.E.2d 251, 254 (1974) ("Where the language is clear and unambiguous, the court is obliged to interpret the contract as written, and cannot, under the guise of construction, reject what parties inserted or insert what parties elected to omit." (citation and quotation omitted)). The Amended and Restated Contract specifically states that the Debtor performed all obligations under the Original Contract. It also provides that the earnest money under the Amended and Restated Contract consists of both $65,000.00 "which represented the "Earnest Money" under the [Original] Contract" and an additional $5,000.00. It specifically identifies and separates the first earnest money deposit from the new consideration being paid by Zion.

**3. 11 U.S.C. § 506(c)**

In the event the court finds that BB&T does have a security interest in the earnest money deposit as proceeds of the real property, the Debtor asserts that it is entitled to be reimbursed for expenses under 11 U.S.C. § 506(c). In support of its request, the Debtor has submitted an

11

itemization of such expenses in the amount of $132,779.43, including $105,379.40 in attorney fees and $27,400.03 for maintenance, utilities, and insurance.

Section 506(c) is an exception to the general rule that the costs of administration of a bankruptcy case be absorbed by the bankruptcy estate. *See Kivitz v. The CIT Group/Sales Finance, Inc*., 272 B.R. 332, 334 (D.Md. 2000) ("As a general rule, administrative costs of a reorganization, including attorneys' fees incurred in connection with efforts to reorganize the debtor, may not be charged against the collateral of a secured creditor."). It allows a trustee to recover from property securing an allowed secured claim expenses that: (1) were incurred in preserving or disposing of the debtor's property; (2) provided a direct benefit to the secured creditor; and (3) were reasonable and necessary. *In re K&L Lakeland, Inc.*, 128 F.3d 203, 207-08 (4th Cir. 1997); 11 U.S.C. § 506(c). The Fourth Circuit has construed § 506(c) narrowly. *Id.* at 207. The claimant has the burden of proving that the expenses qualify under § 506(c). *In re Ferncrest Court Partners, Ltd.*, 66 F.3d 778, 782 (6th Cir. 1995); *In re Ceron*, 412 B.R.41, 48 (Bankr. E.D.N.Y. 2009). Section 506(c) requires that the secured creditor receive a direct and quantifiable benefit and is not satisfied by possible or speculative benefits. *In re Grimland,* 243 F.3d 228, 232 (5th Cir. 2001); *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1261 (9th Cir. 2000); *In re Flagstaff Foodservice Corp*., 762 F.2d 10, 12 (2nd Cir. 1985). *See also In re Crutcher Concrete Const*., 218 B.R. 376, 380-81 (Bankr. W.D. Ky. 1998). ("To demonstrate such a benefit, the Trustee must show that the secured creditor received over and above that which it could have realized without the Trustee's intervention. Accordingly, the required benefit is usually limited to the *actual foreclosure costs saved* by the lienholder where the full satisfaction would not otherwise have been realized because the secured claim exceeded the

value of the encumbered property." (internal citations and quotations omitted)).

In connection with this proceeding, Nicholls & Crampton received a $25,000.00 retainer from the Debtor. From this retainer, Nicholls & Crampton was paid $12,314.00 for prepetition services and $52.53 for expenses incurred prior to filing the petition. Post-petition, Nicholls & Crampton incurred the following fees and expenses: (1) $172,220.95 for the period from January 10, 2007 to November 8, 2007; (2) $27,258.18 for the period from November 9, 2007 to December 19, 2007; and (3) $58,738.70 in post-confirmation fees for services render during the period from December 20, 2007 to October 15, 2008. The Debtor asserts that, of these amounts, $105,379.40 constitutes expenses under § 506(c). Therefore, the Debtor must show that these expenses were incurred in preserving and disposing of the Real Property, that they provided a direct benefit to BB&T, and that they were reasonable and necessary.

Given the facts and circumstances present in this case, the court cannot find that these expenses were incurred in preserving and disposing of the Real Property or that a benefit was conferred to BB&T. The Debtor contends that it is seeking payment for attorney fees incurred in the disposition of BB&T's collateral. The court notes, however, that BB&T has already paid fees in the amount of $14,166.50 and expenses in the amount $88.87 that the Debtor incurred in connection with the disposition of the Real Property, which was ultimately sold at auction. Thus, the Debtor is actually seeking fees for a sale that was never completed. BB&T received no benefit, direct or otherwise, from these post-petition efforts. The $65,000.00 earnest money deposit had already been received prepetition.[1] If anything, BB&T was disadavantaged by the

---

[1] At the hearing, counsel for the Debtor asserted that on the Petition Date, the Debtor and Zion Temple disputed whether Zion Temple had forfeited the $65,000.00 earnest money deposit. If the Debtor incurred fees in negotiating its right to these funds, the court would consider those to

13

continued delays in the case. In *In re Mall at One Associates, L.P.*, the court, similarly faced with an application for § 506(c) expenses relating to a sale that did not close, stated as follows:

> The Debtor also seeks fees in reference to the proposed sale of the Mall to New Plan. However, it must be recalled that the proposed sale to New Plan never materialized, triggering the auction process. Section 506(c) does not provide for recovery of hypothetical benefits, or benefits that may have been conferred if a certain event had occurred. In that sense, the wisdom of hindsight may properly be utilized, and may be sufficient, to eliminate a particular aspect of a § 506(c) claim. [The creditor] did not receive any benefit from the proposed sale to New Plan.

185 B.R. 981, 991 (Bankr. E.D. Pa. 1995).

Ultimately, the liquidation costs incurred in this case far exceeded what BB&T would have incurred if it had liquidated the Real Property itself. BB&T incurred its own counsel fees throughout the bankruptcy proceeding, paid the auctioneer commission of $169,500.00, the Debtor's attorney fees and expenses that were related to the auction of $14,255.37, and it funded the payment of utilities, maintenance, and insurance on the Real Property for over two years.

When this case was filed, it appeared as though all creditors would be paid in full. The Real Property was subject to a contract for sale to Zion Temple for $6,500,000.00, an amount well in excess of BB&T's claim. The Real Property was the Debtor's only asset, and as the Debtor had no ongoing business operations, there were no issues regarding marketing it as a going concern. The schedules reflect that the only priority claim against the Debtor was for ad valorem taxes, for which BB&T was ultimately responsible. The Debtor listed only $78,267.87

---

have provided a direct benefit to BB&T. The court has reviewed the time records submitted, however, and was unable to ascertain what, if any time, was expended in this regard. In fact, most of the time entries during the relevant time period reference noncompliance issues related to Zion Temple and the Debtor's conditions for reinstatement.

in unsecured claims, $74,000.00 of which was owed to Macon White, the individual who signed the Debtor's petition as managing member. The only reason for the Debtor to file a Chapter 11 proceeding, rather than either a Chapter 7 proceeding or allowing BB&T to foreclose, was to realize some value for the few creditors other than BB&T and for equity holders. The court concludes that the Debtor has failed to establish that the requested attorney fees were incurred in preserving or disposing of the Real Property and provided a direct benefit to BB&T, and it is not entitled to recover them under § 506(c).

Turning to the maintenance, utility, and insurance costs in the amount of $27,400.03, the court finds that these expenses were incurred to preserve BB&T's collateral, and also that BB&T consented to the payment of these administrative expenses. BB&T allowed the Debtor to pay these expenses with the rental income from the cellular telephone tower which was subject to the assignment of rents in the Deed of Trust.[2] At the same time, however, BB&T is entitled receive a credit for these funds, totaling $31,050.00 as reflected in the monthly reports, against these expenses.

**4. 11 U.S.C. § 552(b)(1)**

The Debtor contends that even if BB&T has a security interest in the earnest money deposit, it should be eliminated by the court based upon the equities of the case pursuant to § 552(b)(1), which provides:

> (b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security

---

[2] At the hearing on this matter, counsel for BB&T indicated to the court that BB&T did not object to the Debtor's use of the rents at the time, as the funds were being used to pay expenses related to the real property.

15

> interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, *except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise*.

11 U.S.C. § 552(b)(1) (emphasis added). Courts should look at the amount of time and unencumbered estate funds expended on the collateral, the position of the secured party, and the rehabilitative nature of the bankruptcy case when determining whether the equitable exception set forth in § 552(b)(1) may be applicable. *In re Laurel Hill Paper Co.*, 393 B.R. 89, 93 (Bankr. M.D.N.C. 2008). Those factors are not present here. This case is a liquidation, not a reorganization, and the Debtor utilized BB&T's collateral, the income received from the cellular phone tower lease, to pay the ongoing expenses of maintaining the collateral. The court does not find that the equities of this case warrant application of the § 552(b)(1).

### 5. Conclusion

BB&T's motion for order requiring disgorgement and turnover of attorneys fees is granted, and the Debtor is entitled to no further payment under § 506(c). Counsel for the Debtor is further ordered to remit $65,000.00 to BB&T within 10 days after this order becomes a final order.

"End of Document"