IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

07-00054-5-JRL

C O P Y

In re:
                           )

D&M LAND COMPANY, LLC,       )

                           )       TRANSCRIPT OF HEARING

              Debtor. )

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

_____

Motion by Debtor for Final Decree

_____

Tuesday, January 5, 2010
11:10 o'clock a.m.

Honorable Catharine R. Carruthers Presiding

_____

Atlantic Professional Reporters
Winston-Salem, NC  27116-1672

D&M Land Company, LLC     Hearing Transcript                    1/5/2010

APPEARANCES OF COUNSEL

Stephani W. Humerickhouse, Esq.

Gregory B. Crampton, Esq.

Daniel C. Bruton, Esq.

Kevin Sink, Esq.

OTHER APPEARANCES

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

I N D E X

PROCEEDING                                               4


EXAMINATION

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| Sink, Kevin | 40 | | | |
| By the Court | 56 | | | |

_____


FINDING OF THE COURT                                     --
ADJOURNMENT                                              82
REPORTER CERTIFICATE                                     83
CERTIFICATE OF MAILING                                   84


E X H I B I T S

| Name | Offered By | Identified | Admitted |
|------|-----------|------------|----------|
| Exhibit 1 | Movant | 53 | 56 |
| Exhibit 2 | Movant | 53 | 56 |

D&M Land Company, LLC      Hearing Transcript                1/5/2010

                                                              Page 4

     1                  P R O C E E D I N G

     2        (11:10 o'clock a.m.)

     3                    THE CLERK:  D&M Land Company LLC,

     4    its motion by debtor for final decree.

     5              Attorney for debtor is Stephani

     6    Humrickhouse and Gregory Crampton.  Attorney for

     7    creditor is Walter W. Pitt and Daniel Bruton.

     8    Bankruptcy administrator is Marjorie K. Lynch.

     9                    THE COURT:  Good morning.  Happy New

    10    Year.

    11                    MS. HUMRICKHOUSE:  Good morning.

    12                    MR. BRUTON:  Dan Bruton with BB&T.

    13    I -- I guess this is my motion, or at least my

    14    objection to their final -- motion for final decree.

    15              I don't know how the Court wants to go

    16    about dealing with this.  I guess the first issue

    17    would be whether BB&T has a lien on the $65,000

    18    deposit.

    19              If that question's answered in the

    20    affirmative, then I guess we get into the issues of

    21    506(c) and things of that nature.

    22                    THE COURT:  And did you get a chance

    23    to review the documents that were filed last night?

    24                    MR. BRUTON:  Well, I read them.  I

    25    haven't studied them as I would like.  And as Your

D&M Land Company, LLC         Hearing Transcript                    1/5/2010

Page 5

1   Honor knows, there's a local rule that requires

2   papers be filed within three days.  But we'll deal

3   with it as appropriate.

4                    THE COURT:  Well, let's -- let's

5   deal with the first issue first.

6                    MR. BRUTON:  Okay.  I'm sure Your

7   Honor has read all the papers.  A -- a little bit of

8   background -- I'll try to be brief.

9                    This case has a genesis with Ronald Dwayne

10  White, Grand Eaton Ferry Sales and Service.  And that

11  was a boat retail store out in Lake Gaston, North

12  Carolina.  As hindsight would have it, Mr. White was

13  double financing his boats with GE Commercial Finance

14  and BB&T.  GE had a prior secure -- prior -- prior

15  UCC filing, BB&T the second.  GE got paid almost in

16  whole.  BB&T got stuck holding an empty bag in the

17  Eaton Ferry bankruptcy case -- left owing, I think,

18  $6 million, give or take.

19                    Right when that house -- house of cards

20  came crumbling down, BB&T had refinanced the loan to

21  the debtor here, D&M Land Company, to finish the

22  construction of a facility in Raleigh that they were

23  going to open up a new boat store.  That loan was

24  extended into September of '05.  Dwayne White's fraud

25  came to light right around December 1 of '05.  So the

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 6

 1    D&M loan was only in place for three or four months.

 2    D&M never had any operations, never had any

 3    employees, never opened their doors, never sold a

 4    boat.

 5              The loan to BB&T was secured by a -- a

 6    security agreement granting a security interest in

 7    various items, equipment, inventory, general

 8    intangibles.  There's also a deed of trust that

 9    granted to B -- BB&T a lien on all the proceeds, the

10    disposition of the land, all rents and profits.

11              D&M filed bankruptcy in, I think, January

12    '07.  Prior to that, there was a sale -- a contract

13    to Zion Church, as the parties have called it.  A

14    $65,000 deposit was paid at that time.

15              The bankruptcy case was filed in '07,

16    January '07.  Subsequent thereto there were some

17    amendments to the contract.  Counsel for D&M filed a

18    motion to approve the sale to Zion Church.  That sale

19    was approved -- or an amended contract was approved

20    that still contained the initial $65,000 deposit, an

21    initial 5,000 deposit -- deposit, and two extension

22    fees for $25,000 a piece.

23              Later another contract was entered into

24    after those closing deadlines had passed, and an

25    additional 65,000 -- or I think it was actually

D&M Land Company, LLC       Hearing Transcript                    1/5/2010

1    67,500 deposit was paid.  In total, the debtor

2    collected approximately $183,000 from Zion Church and

3    they ultimately never closed on the property.

4              In the meantime debtor's counsel filed a

5    -- a fee application for $179,000 in fees, I think,

6    something like that.  And they also filed a motion to

7    seek the use of BB&T's cash collateral.  BB&T, of

8    course, objected to that on the grounds that it had

9    an interest in the general -- general intangibles,

10   and all, you know, admittedly from the get-go.

11             I think this -- this fourth circuit case,

12   which is the Old Stone Bank case, is the dispositive

13   of this hearing today.

14             Admittedly, I didn't -- nobody knew about

15   that case back when the cash collateral motion was

16   first heard before Judge Small.  It wasn't discussed

17   -- nothing.

18             I learned of the Design -- or the Old

19   Stone Bank case subsequent to that in rela -- in --

20   in connection with another case.  And I read it and I

21   instantly knew it had application to this case as it

22   ---

23             THE COURT:  --- Judge Whitley's

24   case?

25             MR. BRUTON:  I beg your pardon?

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 8

1                     THE COURT:  Judge Whitley's case, I

2      take it, the deposit case in the west?  Is that ---

3                     MR. BRUTON:  --- I -- I don't -- I

4      don't think it was Judge Whitley.  I -- I don't

5      remember.

6                     But -- so, anyhow, so Judge Small entered

7      an order saying we're going to let them -- and -- and

8      not that it has any relevance today -- but, frankly,

9      the whole 83,000 -- $183,000 would've been subject to

10     BB&T's deed of trust.  We didn't argue that before.

11     We told Judge Small we're interested in the $65,000

12     at issue.  And that's what we're here arguing about

13     here today.

14                    Judge Small entered an order saying we'll

15     -- we'll -- we'll let them use the money.  If BB&T

16     doesn't get paid in full in the future, then we'll,

17     you know, have a hearing at a later date.

18                    The sale to Zion Church fell through for

19     6.5 million dollars.  The backup sale to South --

20     South Bridge Fellowship, I think it was, for 6.3

21     million dollars fell through.  They collected $30,000

22     from that earnest money deposit -- which they applied

23     to their attorney's fees, I presume.

24                    You know, global recession, real estate

25     market collapse in property sales, ultimately an --

D&M Land Company, LLC        Hearing Transcript                 1/5/2010

 1    an auction in March of 2008 for 4.2 million dollars.

 2    BB&T was the high bidder -- submitted a credit bid --

 3    facing deficiency over a million dollars at this

 4    point with -- with accrued interest and what not.

 5              Debtor's firm files a motion for final

 6    decree, requesting final decree.  We file our motion

 7    for disgorgement.

 8              I want to be frank.  No lawyer likes to

 9    bring a motion for disgorgement, especially one

10    against a law firm where their -- one of their

11    principals is becoming a federal bankruptcy judge

12    tomorrow.  Talk about a situation of cutting --

13    cutting off my nose to spite my face.  But that

14    notwithstanding, I have the obligation to my client.

15    And I think BB&T has a lien on these monies and is

16    entitled to these monies.

17              It's unfortunate that the bankruptcy case

18    wasn't a success.  But BB&T's not the guarantor of

19    administrative fees in this case.

20              THE COURT:  All right, thank you.

21              Which one of you?

22              MS. HUMRICKHOUSE:  I'm going to

23    argue.  I also wanted to alert the Court that Kevin

24    Sink is also here on behalf of the debtor, D&M Land.

25              Your Honor, we apologize for breaching any

D&M Land Company, LLC       Hearing Transcript                    1/5/2010

1  local rules.  This is an Eastern District case that

2  you're hearing kind of in a specialty.  And to be

3  quite honest, I didn't even think of any different

4  local rules that there might be in the Middle

5  District.  We don't have that three-day rule in the

6  Eastern District.  So I apologize.

7           Because of the holidays that have kind of

8  come up on us, we were unable -- we would have been

9  unable to -- to respond to the latest response that

10  -- that -- or document that was filed by Mr. Bruton

11  in -- within that three-day period.  And, honestly,

12  we did the best we could under the circumstances.

13           There is nothing, however, in the papers

14  that we filed yesterday that Mr. Bruton or BB&T

15  shouldn't have been completely aware of.  All we did

16  was draw upon the pleadings in the case that -- that

17  I think actually should decide this matter.

18           I think this matter should be decided

19  based upon what the terms of the confirmed plan were.

20  There was a plan confirmed in this case.  It was a

21  consensual plan and it was a plan that was

22  affirmatively voted for by BB&T.

23           And that plan, which is attached to our

24  latest response -- the third modification to that

25  plan, which was -- which amended the plan -- and the

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 11

1   entire plan as amended was confirmed by Judge Small

2   -- sets out specifically what rights BB&T has in this

3   case to claim -- it -- it sets up, just like any

4   confirmed plan, what the rights of the parties are.

5   And I believe that the third modification and it's

6   provisions are dispositive of the controversy that we

7   have here today.

8        I think that Judge -- that Judge Small,

9   when he ruled upon the cash collateral motion -- and

10  -- and, Your Honor, the first thing I -- I probably

11  need to say, if I could go back, is that we disagree

12  that any of the history and background that Mr.

13  Bruton felt compelled to give the Court is relevant

14  in any way, shape, or form.  If we were going to

15  litigate the relevant blame in this case, we

16  certainly could come up with some BB&T matters.  But

17  it's not relevant to the issue that's before us.  So

18  we won't go into that.

19        But basically there -- this was a case

20  where there was -- from the get-go the parties wanted

21  to market this property.  There was a mediated

22  settlement.  The mediated settlement required that

23  the debtor market this property.  It was a

24  requirement at the mediation -- and I can't recall

25  whether Mr. Bruton was there.  I know Mr. Pitt was

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 12

1    there.  But I believe you were there, too.

2              But one of the negotiated provisions of

3    that mediated settlement was that the debtor would

4    market this property.  There was no motion for relief

5    from stay filed by BB&T in this case other than a

6    stay motion to allow them to bring an action against

7    D&M.

8              There was the Eaton Ferry case, the D&M,

9    and they felt as though they needed relief from the

10   stay to initiate an adversary proceeding.  So that's

11   the only stay motion that -- that was filed in this

12   case.  This mediated settlement was a global mediated

13   settlement.  That mediated settlement was then

14   incorporated into a plan that was consensual and that

15   was confirmed.

16             So we have a new document that now

17   regulates and determines the rights of the parties.

18   And that new document in -- in specific part -- and I

19   -- if I could refer the Court to the third

20   modification -- basically says that BB&T asserts that

21   it holds a perfected security interest in debtor's

22   general intangibles.  And that said security interest

23   covers 65,000 of monies received by the debtor as

24   earnest money relating to the sale of debtor's real

25   estate.

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 13

```
 1                 The debtor disputes BB&T's secured claim

 2      in that disputed escrow funds.  And so the plan

 3      provides that BB&T shall retain its security interest

 4      in debtor's general intangibles to the extent the

 5      same existed on the petition date and to the extent

 6      any such security interest was valid and enforceable

 7      post petition.

 8                 In the event the validity of BB&T's

 9      asserted security interest in the disputed escrow

10      funds becomes a pertinent issue post confirmation,

11      the court shall determine the issue -- retention of

12      jurisdiction by the court.

13                 Debtor retains its right to contest BB&T's

14      asserted security interest in the disputed escrow

15      funds including the right to seek recovery from BB&T

16      pursuant to 11 USC section 506(c) of necessary costs

17      and expenses of preserving and disposing of debtor's

18      real property from and limited to the extent of any

19      allowed BB&T security interest in the disputed escrow

20      funds.

21                 Your Honor, that is the provision that

22      regulates the rights and duties of both parties

23      sitting in this court room today.  BB&T has the right

24      to assert its claim of a security interest in the

25      $65,000 at issue.  Its right is limited to basing
```

D&M Land Company, LLC        Hearing Transcript                1/5/2010

Page 14

1    that claim on the right that it asserted, which is

2    that on general intangibles.

3              And in order to know the genesis of that,

4    Your Honor, it's necessary to look back on the order

5    -- the cash collateral order that was entered by

6    Judge Small on December 7th.  And in that order Judge

7    Small questions the security interest but doesn't

8    determine it.  And what he basically says is that

9    BB&T acknowledges that it does not have an interest

10   in the extension fees and deposits paid by Zion

11   Temple post petition.  But it contends that the

12   pre-petition deposit in the amount of $65,000 is

13   subject to its security interest in general

14   intangibles and thus is its cash collateral.

15             The parties limited this issue to a right

16   arising out of general intangibles and they then

17   incorporated that into a confirmed plan.  And so the

18   -- so the parties are limited by what this plan

19   provides.  And I think that what -- the issue that is

20   very narrow, and that is, number one, does BB&T have

21   a security interest in general intangibles -- and I

22   think that we would concene that -- concede that on

23   the petition date it did in fact have a security

24   interest in general intangibles.  It filed a UCC that

25   covered its general intangibles.

D&M Land Company, LLC      Hearing Transcript                1/5/2010

Page 15

 1            And then the question is whether or not

 2   there was any pre-petition deposit that that lien on

 3   general intangibles could attach.  And if so, BB&T

 4   has a lien, and if not, it does not.

 5            That -- now it becomes important to

 6   understand the -- the actual facts of how the

 7   contracts developed in this case.  Prior to the

 8   filing of the bankruptcy in this -- of -- of this

 9   bankruptcy in January of '07, the debtor entered into

10   a form -- bar form contract, which we call the

11   original contract, for the sale of this property

12   subject to the deed of trust held by BB&T for 6.5

13   million dollars.  And the debtor took a $65,000

14   earnest money deposit.  That's a pre-petition

15   contract.  And that pre-petition contract, because it

16   wasn't drafted by attorneys, neglected to set forth

17   permitted exceptions.

18                    THE COURT:  Not to interrupt you.

19                    MS. HUMRICKHOUSE:  Sure.

20                    THE COURT:  But if you look at the

21   paragraph that you have in your supplemental

22   response, the -- the very first sentence says BB&T

23   shall retain its first deed of trust interest on the

24   debtor's real property as described in that deed of

25   trust.

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

1                    MS. HUMRICKHOUSE:  Right.  And

2    that's a normal -- you have to take that in the

3    context of a plan.  BB&T did retain its right of this

4    deed of trust.  No one is saying that it gave up its

5    deed of trust.  And that's a normal plan provision,

6    Your Honor, that we would say you retain your right

7    to a deed of trust.

8                    But you have to then look at the next one

9    where it says and they also have this claim to

10   general intangibles.  And that's where this issue --

11   it -- the -- the parties did not intend -- and I

12   think that Mr. Bruton actually admitted that he was

13   not aware that there might be an argument arising out

14   of the deed of trust and therefore did not make it.

15                   And that's why the court in its cash

16   collateral order very clearly says this dispute is

17   about whether or not there is a general intangibles

18   issue.

19                    THE COURT:  But ---

20                    MS. HUMRICKHOUSE:  --- And that's

21   why the parties put it in.

22                    THE COURT:  What Judge -- and I --

23   you know, Judge Small knows what he said better than

24   I do, but what Judge Small said is there is some

25   question about whether BB&T does hold an enforceable

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 17

1    lien on the pre-petition deposit.

2                    MS. HUMRICKHOUSE:  Right.  But he

3    says that in the context of him describing what

4    BB&T's position is, which is it contends that the

5    pre-petition deposit in the amount of 65,000 is

6    subject to its security interest in general

7    intangibles.

8                    And -- and he -- he -- he says that while

9    the validity of BB&T's security interest in general

10   intangibles has not been fully addressed and the

11   court is not ruling on that issue, there is some

12   question about whether BB&T does hold an enforceable

13   lien on the pre-petition deposit.

14                   I think you have to read that sentence

15   together.  He's talking about general intangibles.

16   He's not talking about the deed of trust.

17                   Your Honor, if in fact the deed of trust

18   was -- was the relevant security interest, then BB&T

19   would have claimed an interest in all of the

20   extension fees and deposits.  It did not, because it

21   was not claiming its security interest as growing out

22   of the deed of trust.  It was claiming its security

23   interest as growing out of the general intangibles.

24   And the -- and the judge noted that and that was then

25   placed into the confirmed plan.

D&M Land Company, LLC       Hearing Transcript                    1/5/2010

Page 18

1               So it's our position that they're limited

2     -- real limited in that provision as well.  The

3     debtor is limited because it cannot seek 506(c)

4     expenses in excess of the 65,000.  That was the deal.

5     That's the plan provision.  It was consensual with

6     give and take on both sides.  You want to object,

7     BB&T -- you can object on the basis of general

8     intangibles.

9               If you can show that this deposit, this

10    $65,000, is subject to your security interest in

11    general intangibles, then we will also have the right

12    to assert our 506(c) expenses.

13              That brings me to why I think it's also

14    not appropriate for BB&T to claim any 507 super

15    priority expenses, because a confirmed plan

16    determines what claims there can and cannot be.  And

17    there are no super priority administrative claims

18    retained by this confirmed plan.

19              Now, Your Honor, the -- it -- I -- have I

20    answered your question?  I -- you may not agree with

21    me.  But have I answered your question so that I ---

22                    THE COURT:  --- Yes.

23                    MS. HUMRICKHOUSE:  Okay.  As far as

24    -- I think it's necessary to then look at how the

25    contracts developed, because the short version that

Page 19

1   was given by Mr. Bruton I -- I think needs to be

2   elongated a little bit.

3            And that is, as I started out, there was a

4   September 2006 contract that was a pre-petition

5   contract that was on a bar form that didn't have the

6   permitted exceptions that was supposed to have closed

7   on January 18th of 2007.  The debtor was unable to

8   convey the title that was required by that contract

9   because of a cellular tower lease that was on the

10  property that had been neglected to have been recited

11  as a permitted extension -- exception under that

12  contract.  And when January 18th came, the debtor

13  could not convey title.  Prior to January 18th, a

14  chapter 11 was filed.

15           The debtor never attempted to assume that

16  contract or have that original contract approved by

17  the court because it knew it could not comply with

18  that contract.

19                THE COURT:  Well, then let me stop

20  you again and ask you to turn to the second page of

21  the amended and restated contract.

22                MS. HUMRICKHOUSE:  Okay.

23                THE COURT:  Paragraph five.  Last --

24  last night was the first time I've heard that

25  argument raised.

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 20

1                    MS. HUMRICKHOUSE:  Uh-huh.

2                    THE COURT:  That the debtor couldn't

3    convey title.

4                    MS. HUMRICKHOUSE:  Right.

5                    THE COURT:  And in this restated

6    contract it says the buyer specifically acknowledges

7    and agrees that the seller has performed all of its

8    obligations under the initial contract.

9                    MS. HUMRICKHOUSE:  And that is the

10   result of the negotiations that occurred between

11   January 18th and May 19th where Zion was contesting

12   that.  So as -- and as part of the agreement to -- to

13   have a new contract that would allow Zion to continue

14   to show its interest in the property, we negotiated

15   that provision so that there would be no contest as

16   to the rights of -- or the forfeiture rights of the

17   nonrefundability of any monies received.

18            It's important to know, Your Honor, that

19   on -- in April of this year, which is one month

20   before this amended and restated contract was finally

21   negotiated, that Zion filed a proof of claim, because

22   it took the position that it had a right to the

23   return of the earnest money under the original

24   contract.  And that's a matter of -- of the -- that's

25   a matter of the record in the Eastern District.

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 21

1              The original contract had a January 18th

2      closing date and a time-is-of-the-essence provision.

3      So that contract was in default as soon as there was

4      no closing on January 18th.  So there is a default.

5              This restated contract, this new contract

6      is the result of five months of negotiations between

7      the debtor and the Zion Temple Church to renew their

8      interest, to evidence their renewed interest.

9              And it was that negotiation that resulted

10     in us trying very hard -- and we were involved in the

11     negotiation of this.  That's why it has these words

12     in it -- to make sure that there could never be any

13     ability for them to come back and try to get money

14     from the -- from the debtor.  So this is the result

15     of negotiations.

16              I mean, it's very clear that there was a

17     default under the -- under the first contract because

18     we didn't meet the January 18th closing deadline.

19     But that's why -- that's -- that is -- that contract

20     was over.  It is superseded by the terms -- and I

21     think that you're familiar with the -- with the....

22                      THE COURT:  I understand that.

23                      MS. HUMRICKHOUSE:  You understand

24     that.  Right.

25                      THE COURT:  I understand that --

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 22

1   that your contention that because this amended and

2   restated contract said that the contract was amended,

3   modified, superseded and restated, that you contend

4   there is a new contract.

5              However, Judge Small has already made a

6   finding in his order regarding the use of cash

7   collateral at the top of page two that the original

8   contract was amended post petition.  That's Judge

9   Small's finding.

10             MS. HUMRICKHOUSE:  Let me just find

11  that quickly, Your Honor.

12             THE COURT:  It's in the order

13  regarding the motion for the use of cash collateral,

14  page two.

15             MS. HUMRICKHOUSE:  And -- and that's

16  -- and -- and I'm not sure that that is anything

17  other than his narrative.  I'm not sure that that's a

18  finding, Your Honor.  I understand why you would --

19  you would see it that way.  But I think it was -- at

20  that point in time the original contract is -- is --

21  he's -- he's basically telling a story about how this

22  -- this case developed and how there were more than

23  one contract.  I think that's an unfortunate use of

24  words and I don't think he intends to make a finding

25  at that point.  But I can understand Your Honor

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 23

 1    seeing it that way.

 2              The original contract could not have been

 3    amended post petition without court approval.  That

 4    original contract was never approved by the court.

 5    There never was a motion to approve it.  What was

 6    approved was the amended and restated contract.  And

 7    -- and -- and -- and that -- that clearly is our --

 8    our -- our argument.

 9              And -- and there was an -- there was a

10    reason why there had to be a new contract -- because

11    we had to be able to permit the exceptions that we

12    needed in order to be able to convey good title.  We

13    could not convey good title under the original

14    contract.

15              And in -- in bankruptcy, in a chapter 11,

16    we would have to be able to assume -- either assume a

17    contract -- if -- if in fact this contract was a

18    pre-petition contract, then we had to assume a pre --

19    or reject a pre-petition contract.  We couldn't just

20    do nothing with it.  I mean, it had to be assumed.

21                   THE COURT:  Well, then what's the

22    reason for using the words amended and restated?

23    What's the purpose of that at all if it was a

24    completely new contract?

25                   MS. HUMRICKHOUSE:  I think it was

D&M Land Company, LLC          Hearing Transcript                    1/5/2010

Page 24

 1  meant to try to reflect the fact that we were dealing

 2  with the same parties and that we were reinvoking the

 3  negotiations and trying to maintain the relationship.

 4            You know, at the time, Your Honor, I mean,

 5  obviously nobody was thinking that we would be here

 6  today.  And, you know, should it have been new

 7  contract -- I mean, you can tell that it's a very

 8  different type of contract.  It's not a bar form.  It

 9  is obviously a drafted contract.  And I think that

10  the -- the -- the fact that we used amended and

11  restated -- but we clearly said superseded.

12            THE COURT:  Well, amended, modified,

13  superseded all have various meanings, none of which

14  are the same.

15            MS. HUMRICKHOUSE:  I -- I -- I am

16  told -- and - -and I apologize for leaning over --

17  there's a reason there's three of us here -- because

18  we were all involved in different parts of this case.

19  And I -- I believe that Mr. Sink was the one who was

20  involved in these negotiations the most.  And I think

21  that the church with its congregation -- our

22  understanding of this -- in order to be able to

23  explain the fees that were necessary to -- for us to

24  agree to engage in negotiations again, they needed it

25  to be stated that way.  And that -- and they had a

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 25

1    part in naming the document is my understanding.  And

2    Mr. Sink can certainly deal with that.

3              It was not intended to be -- because we as

4    chapter 11 practitioners knew that if we were going

5    to keep in any way that original contract, we had to

6    assume it.  I mean, it is an executory contract if in

7    fact it did not end when we say it ended.  And we

8    never chose to assume it.

9              In fact, what we did was we filed a

10   separate motion to approve the sale pursuant to the

11   amended and restated motion.  And that's how --

12   that's how we proceeded.

13              MR. BRUTON:  Your -- Your Honor, can

14   I inter -- and I hate to interrupt.  I just want to

15   interject one thing.  I'm not sure all of this is

16   relevant as to the issue of the general intangibles.

17   I didn't -- I didn't come here today prepared to have

18   an argument about whether BB&T has a security in --

19   or perfected secure -- or whether its security

20   interest in general intangibles applies to the

21   deposit.

22              When we filed our motion on October 16th,

23   I raised the Old -- the Old Stone Bank issue.  They

24   responded, and they spoke about Old Stone -- Stone

25   Bank, and I responded again.

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 26

```
 1              Frank -- frankly -- and I'll -- when I

 2    drafted my original motion in -- which was filed on

 3    October 16th, it was about twice as long as it is now

 4    because it did contain the general intangibles issue.

 5    But I thought, well, this Old -- Old Stone -- Stone

 6    Bank case totally -- oops -- disposes of all that.

 7    It's not necessary.  So I took it out.  And so -- and

 8    -- and then last night I -- I learned that general

 9    intangibles is back, you know, to the floor.

10              So I'm not prepared to discuss that today

11    because I didn't know it was going to be an issue

12    today.  If Your Honor determines that B -- that

13    BB&T's lien interest under the deed of trust does not

14    apply to the $65,000, well, then we might have to

15    have another hearing on the general intangibles

16    issues.

17              So all this discussion about amended

18    contracts and what not I'm not sure is relevant as to

19    the deed of trust -- which I think is what we need to

20    discuss today, Your Honor.

21                    THE COURT:  Well, let me tell you

22    why it might be relevant.

23                    MR. BRUTON:  Okay.

24                    THE COURT:  Okay.  In the first

25    contract, the -- normally when you think about
```

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 27

```
 1   deposits, you think that they're liquidated damages.

 2   Okay?

 3                  MR. BRUTON:  Okay.

 4                  THE COURT:  In North Carolina.  All

 5   right, in the first contract it just says it's

 6   forfeited, which doesn't make it liquidated damages.

 7   All right, and that was the contract that was in

 8   existence pre-petition, and basically you win --

 9   pretty clear to me when you look at the Old Stone,

10   because I don't think you can distinguish that much.

11                  This amended and restated contract has the

12   liquidated damages provision in it.  And it covers

13   the 65,000 plus the -- the extra money.  But I don't

14   know that if you had a lien at the time that the case

15   was filed, that this can do anything to take away

16   your lien.

17                  MR. BRUTON:  This meaning?

18                  THE COURT:  This -- the restated

19   contract, where it talks about liquidated damages --

20   because to -- to me that's sort of where, you know,

21   you look at the fourth circuit and you go, gosh, you

22   know, isn't it a liquidated damage claim as opposed

23   to proceeds, such that it would go back to the debtor

24   -- because I think that's what happens with our

25   chapter 7 trustees basically.  If they take a deposit
```

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 28

 1    and somebody doesn't close, that money's not going to

 2    BB&T.  That money actually goes to the benefit of all

 3    the unsecured creditors in the case.  But that's

 4    because it's treated as liquidated damages.  And in

 5    North Carolina, unless you designate it as liquidated

 6    damages, it's not liquidated damages.  And there are

 7    cases out there that say if you forfeit the deposit,

 8    then it's proceeds.  And there again, you would win.

 9              So am -- am I prepared to rule from the

10    bench today?  No, no, not given some of the stuff I

11    was thrown last night.  But that's why I went back

12    this morning and looked at what did Judge Small say,

13    what is -- what are the differences.  And, you know,

14    I -- I don't think the -- the plan language is not

15    going to limit you to just general intangibles

16    because it says you retain your rights under the deed

17    of trust.  I mean, I think you've got an uphill

18    battle.  I'll -- I'll just be really candid with you.

19                        MS. HUMRICKHOUSE:  Your Honor ---

20                        THE COURT:  --- And I -- and I --

21    you know, I don't -- I -- nobody likes taking away

22    fees, to know that the firm's got to go and amend tax

23    returns and stuff like that.  I think Judge Small ---

24                        MS. HUMRICKHOUSE:  --- Actually the

25    firm doesn't have to do that, Your Honor.  The three

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 29

1    people sitting at this table ---

2                    THE COURT:  --- Okay.

3                    MS. HUMRICKHOUSE:  --- Have to write

4    a check.

5                    THE COURT:  Okay, all right.  Well,

6    but then the firm should have to amend tax returns

7    because it's not all income that flowed down.  So

8    there are -- you know, there are all those -- there

9    are all of those issues.

10                   I -- I think if Judge Small had any

11   expectation that the property wouldn't have brought

12   enough, that he'd have said you don't know what's

13   happening with the 65, park it.

14                   MS. HUMRICKHOUSE:  See, I -- Your

15   Honor, I -- I -- I -- with all due respect, I -- I

16   was at that hearing and -- and I don't think that's

17   what he would have done.  And, of course, this is

18   speculation -- because I think that he had sincere

19   doubts that this was a pre -- we had made the

20   argument about it being a novation.  And he -- and he

21   says I have -- there is -- you know, I have questions

22   as to whether or not this is a -- they have a

23   security interest.

24                   To be honest with you, my take was that he

25   was in fact leaning the other way and that's -- but

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 30

```
 1   he didn't want to determine it, because he said if I

 2   don't have to determine it, I won't determine it

 3   because maybe this -- everybody -- I think everybody

 4   thought the property was going to -- to solve -- the

 5   -- the sale of the property was going to solve the

 6   question.

 7              I -- I respectfully disagree with you on

 8   the fact -- the limitations of the plan.  And I

 9   realize that -- that what I think about that probably

10   doesn't matter.  But -- but I really believe that the

11   parties intended to limit, and that as much as -- as

12   I think all of us probably at that -- at one point in

13   time said, you know, well, wait a minute.  We have to

14   go back and look at what the plan said.  And that --

15   and that's why we filed what we filed -- because we

16   went, wait a minute.  This deed of trust issue was --

17   this was never anything that was supposed to be the

18   basis for the claim in the security interest.

19              The -- the -- the preamble, that first

20   sentence, Your Honor, is just what you have in every

21   plan, which is the debtor retains its right -- its

22   security interest in the deed of trust -- sure, no

23   question.

24              THE COURT:  Well, that -- but you're

25   saying he doesn't get that.
```

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 31

 1                    MS. HUMRICKHOUSE:  He doesn't get it

 2      -- because when we did the -- when we did this plan

 3      modification, we were trying to cover the cash collat

 4      -- there was a mediation.

 5                    We had a consensual plan.  The -- we -- we

 6      -- we all had a consensual plan.  And then we had to

 7      modify the plan in order to accommodate the mediated

 8      settlement.

 9                    And the day before we make this

10      modification is the hearing on the payment of our

11      fees.  And so we that day had to modify it to reflect

12      what it was that Judge Small had said.  And our

13      understanding and -- was -- and I think that -- I

14      mean, Mr. Bruton has been very -- very honest.  I

15      mean, I think that at the time no one knew about Old

16      Stone and -- or had found Old Stone.  And BB&T was

17      riding the general intangible -- intangibles horse.

18      And that's what was -- what was on everybody's mind

19      at that point.

20                    When you take that, there's an estoppel

21      that occurs.  I mean, we -- we negotiated a plan

22      provision based upon the understanding that the basis

23      for this claim of the security interest was general

24      intangibles.  If it was going to be something else,

25      perhaps that would've been something else.  We were

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 32

 1   all on the same page at that point.

 2              Mr. Bruton has told you that he didn't

 3   find Old Stone until later.  I'm sorry for him,

 4   because I think he may have made different -- taken

 5   different positions in the case.  But unfortunately

 6   he took those positions in the case and people relied

 7   upon them and people drafted consensual plans which

 8   were confirmed based upon those.

 9              And -- and that's why we take the

10   position, Your Honor.

11              THE COURT:  I'm going to have to

12   take a five-minute break.  I'm getting calls.  I have

13   a son who was in surgery this morning.

14              MS. HUMRICKHOUSE:  Sure, sure.

15              THE COURT:  So let me take a

16   five-minute break.

17       (11:46-11:50 a.m. - recess)

18              MS. HUMRICKHOUSE:  Your Honor, if I

19   could just make one other point and -- without

20   belaboring it.

21              If you look at the third modification --

22   and I know that it's important to you what the first

23   sentence says.

24              If the first sentence was all that existed

25   in that paragraph, we would not be here today.  And

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 33

1   the reason we would not be here today is because the

2   confirmed plan without the rest of that paragraph

3   would have taken away any right that BB&T would've

4   had to make a claim for this money.  The -- the

5   confirmed plan would have resolved all claims.

6           And since it wasn't contained in the

7   confirmed plan, they wouldn't have had this.  They

8   wouldn't have had this right to come here and -- and

9   to -- to even -- so -- so their very right to be here

10  grows out of this third modification.  It was

11  negotiated by Mr. Bruton and Mr. Pitt because of the

12  order on cash collateral.  So when it came time for

13  them to cast their ballot on the plan, they demanded

14  that this provision be put in here.

15          But if it just had the first provision,

16  which is they retained their right to the deed of

17  trust, which would have been there -- and remember,

18  it's they retain their right -- their -- their --

19  retains its first deed of trust interest on the

20  debtor's real property -- then -- then we wouldn't be

21  here.  We would not be here.

22          Their rights grow out of the rest of the

23  paragraph.  Their very right to be here today just --

24  which is -- is -- is -- is comparable to why we say

25  -- or supportive of why we say they have no 507(a)

D&M Land Company, LLC      Hearing Transcript                1/5/2010

Page 34

1    rights -- or (b) rights -- excuse me -- because

2    that's not provided in the plan.  If a right to a

3    claim is not provided for, it goes away upon

4    confirmation of the plan.

5              So I think that that adds -- it -- Your

6    Honor, to our understanding of that modification,

7    because it limits and delineates rights that would

8    not -- would under no other circumstances exist

9    except as set forth in that modification.

10              Now ---

11              THE COURT:  --- So you're saying if

12   it -- I -- I just want to make sure I understand.

13              MS. HUMRICKHOUSE:  Sure.

14              THE COURT:  That the plan language

15   would supersede Judge Small's ruling that in the

16   event there was insufficient value in the real

17   property, that BB&T got to revisit the 65,000.

18              MS. HUMRICKHOUSE:  Yes, Your Honor.

19              THE COURT:  Okay.

20              MS. HUMRICKHOUSE:  That is exactly

21   what I'm saying.  I'm -- I -- that -- yes.  And you

22   -- I -- I mean, and basically the effect of

23   confirmation under -- under section 1141 is except as

24   otherwise provided in the plan or in the order

25   confirming the plan, after confirmation of a plan the

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 35

1    property dealt with by the plan is free and clear of

2    all claims in interest of creditors.

3                    THE COURT:  Okay.

4                    MS. HUMRICKHOUSE:  That -- that's

5    really our -- our argument, Your Honor.

6                    THE COURT:  Okay.

7                    MS. HUMRICKHOUSE:  Is that this is

8    the document now and it delineates the rights.  And

9    but for the -- the sentences after the first

10   sentence, there'd be no right for BB&T to even be

11   here today notwithstanding the order that was entered

12   by Judge -- Judge Small.

13              You understand, Your Honor, it -- very

14   much our position on why we believe that this is a

15   post-petition deposit.  So I won't beat that horse.

16   And under 552 general intangibles are, you know, the

17   -- you -- you give up your right in after-acquired

18   property under 552(1).  And if this is not a

19   pre-petition entity, then it is after-acquired

20   property.  Security interest doesn't go -- doesn't

21   attach.  So I won't belabor that.

22              If the Court is unconvinced that that is

23   the -- that the plan prevails, and the plan provision

24   prevails, and that the plan says what we say it does,

25   then we believe that the Old Stone case is

D&M Land Company, LLC       Hearing Transcript                    1/5/2010

Page 36

```
 1    distinguishable.  And, you know, it's -- it's hard

 2    when you have a fourth circuit case that -- at least

 3    I couldn't find -- was -- was cited in any other case

 4    in -- in the district.

 5             I mean, it's one of those where the fourth

 6    circuit holds that under Virginia law -- and -- and I

 7    think it's very clearly that it's under Virginia law

 8    -- that a forfeited earnest money deposit is --

 9    constitutes proceeds, which it must find in order for

10    552 to let the security interest breach the gap --

11    that it -- that a -- that it's proceeds of a

12    pre-petition deed of trust.  And the basis that it

13    says is because proceeds as defined under the UCC

14    means the results of the disposition of the

15    collateral.  And Old Stone goes on and on about

16    disposition.  And then it quotes the fact that under

17    Virginia law, when a contract is executed, there is

18    an actual conveyance of equitable title under

19    Virginia law.

20             But that's not true under North Carolina

21    law.  Under North Carolina law there is no equitable

22    title that is conveyed upon the bare conveyance of a

23    purchase contract.  The -- the two cases that were

24    cited by Mr. Bruton, 1980 cases, are just --

25    unfortunately, I don't believe that they have
```

D&M Land Company, LLC      Hearing Transcript                1/5/2010

Page 37

 1   anything to do with -- with the facts at hand.  It's

 2   easy to just find a little quote that says that

 3   there's an equitable interest granted to a vendee

 4   under a contract.

 5              But if you look at -- at the foreclosure

 6   deed of trust given by Bill and Taylor case, I mean,

 7   that's the -- that's a case where everything, all the

 8   rights in the land, possession, the obligation to pay

 9   taxes, all of the things that one would normally put

10   with title to it were -- were conveyed.

11              So we're not just talking about a bare

12   contract here where there's -- where the court finds

13   that an equitable interest has been conveyed.  But

14   we're talking about the whole ball of wax except for

15   the actual convey -- deed being recorded.  I mean,

16   the commission -- the realtor's commission was paid

17   at the time of this installment contract.  Insurance

18   was paid by the buyer.  He took possession of it.

19   And everything but the actual recordation of the deed

20   occurred.  So I think that's distinguishable.

21              The Carolina Builders case is just a case

22   where we're trying to -- to uphold the legislative

23   intent of treating materialmen fairly.  And in this

24   case the poor vendee or the -- the buyer of the

25   property actually had a deed to the property, had

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 38

1    started construction on the property, and was in the

2    midst, and the only thing that happened was that his

3    deed was delayed in its filing until after the

4    materialmen had done the work -- the construct -- the

5    construction work had been done -- by two weeks.  And

6    the court said there was enough indicie -- indic --

7    indicia -- indicia of possession and ownership and

8    other of the sticks in the ball -- in the -- in the

9    -- in -- in the sticks of -- of ownership that --

10   that we're going to say that equitable title in that

11   case did -- or an equitable -- yeah, they actually

12   say an equitable interest was transferred.

13            So I -- I don't see how these two cases

14   help BB&T in showing that under North Carolina law

15   there is an actual transfer of equitable title when

16   there was a bare contract to sell property.  So I

17   think that -- I think that Old Stone is actually

18   based upon Virginia law.

19            You don't get to the proceeds definition

20   that Old Stone holds onto unless you can show that

21   there was a disposition to -- so that it was proceeds

22   so that it falls under 552.  And I -- and -- and I

23   believe that the fourth circuit would have found

24   differently if it was deciding under North Carolina

25   law in the Old Stone case.

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 39

```
 1                    There is a -- I don't know how far it --
 2     what I'd like to do -- and I don't know how the Court
 3     wants to handle this -- but I think it's important to
 4     the debtor to make some sort of record with regard to
 5     the factual issues surrounding the contracts, because
 6     we believe that whether or not that money was
 7     pre-petition -- or related to a pre-petition contract
 8     or a post-petition contract is -- is very important
 9     to our position.  And we'd like to -- I'd like to
10     actually put Kevin Sink, who was involved in that, on
11     the stand in order to make that record if it suits
12     the Court.
13                    THE COURT:  Any objection?
14                    MR. BRUTON:  Well, you know, again,
15     I -- I'm not prepared to -- these -- these go to
16     general intangible issues.  And, you know, I -- I
17     didn't prepare to go into that today.  And maybe I
18     should have, although I didn't know it was going to
19     be an issue till six o'clock last night.
20                    THE COURT:  All right.
21              I'll let you put Mr. Sink on the stand.
22                    MS. HUMRICKHOUSE:  Okay.  Your
23     Honor, would it be all right if Mr. Crampton did the
24     examination?
25                    THE COURT:  That would be fine.
```

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 40

1                    MS. HUMRICKHOUSE:  Thank you.

2           WHEREUPON,

3               the witness, KEVIN SINK, being first duly

4      sworn to state the truth, the whole truth and nothing

5      but the truth, testified as follows:

6                       DIRECT EXAMINATION

7      BY MR. CRAMPTON:

8           Q.   Would you state your name for the Court,

9      please.

10          A.   Kevin Sink.

11          Q.   Okay.  It would be -- would it be accurate

12     to say you're a surprise witness this morning --

13     would you say?

14          A.   I -- I would say that.

15          Q.   You are -- you are an attorney.  Is that

16     correct?

17          A.   Yes, sir.

18          Q.   And you practice law with the law firm

19     Nichols and Crampton, P.A.?

20          A.   Yes, sir.

21          Q.   And were you involved in the

22     representation of the debtor, D&M Land Company LLC,

23     in its chapter 11 case?

24          A.   Yes, sir.

25          Q.   Does your practice encompass any

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 41

 1    involvement with commercial real estate and real

 2    estate transactions?

 3         A.   Yes.  In the 15 years now I guess that

 4    I've been practicing law, historically commercial

 5    real estate transactions have been a substantial part

 6    off and on over the years of my practice.

 7         Q.   And you are also -- hold a legal

 8    specialization designation from the state bar?

 9         A.   Yes.  I'm an a -- a business bankruptcy

10    specialist as certified by the state bar.

11                   MR. CRAMPTON:  Your Honor, may I

12    approach the witness, please?

13                   THE COURT:  Yes.

14                   MR. CRAMPTON:  And I apologize.  I

15    believe that the contracts -- do -- do you have

16    copies of those contracts?

17                   MR. BRUTON:  Yeah, somewhere.

18                   MR. CRAMPTON:  I believe they were

19    forwarded both to the Court and to -- it should have

20    been all of us.  But these are the -- the original

21    contract and the amended and restated contract.

22              Your Honor, do you....

23                   THE COURT:  I have copies.

24                   MR. CRAMPTON:  Thank you.

25         Q.   (Mr. Crampton)  Mr. Sink, I've handed you

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 42

1    two documents.  Are you familiar with those two

2    documents?

3         A.   Yes, sir.

4         Q.   And the -- the earliest one in -- in time

5    is what we've referred to as the original contract

6    with Zion Church.

7         A.   Yes, sir.  And you're referring to the one

8    with the Graham Realty logo on it.

9         Q.   Right.  And -- and were you involved in

10   the preparation of that first contract, the original

11   contract?

12        A.   No, sir.

13        Q.   The -- in connection with the filing of

14   the chapter 11, you -- you were involved in -- with

15   contact and discussions with the attorney

16   representing Zion Church.  Is that correct?

17        A.   That's correct.

18        Q.   And who was that?

19        A.   It was initially a young lady in Durham,

20   North Carolina that quickly transferred to Robert

21   Gordon of the North Raleigh law firm.

22        Q.   And the -- the -- the debtor did not close

23   the transact -- sales transaction under that first

24   contract, the original contract on the Graham Realty

25   logo.  Is that correct?

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 43

1        A.    That's correct.  The debtor did not have

2    the ability -- the closing date sort of followed

3    shortly after the petition date.  And the debtor did

4    not have the ability to close under the contract

5    because it could not deliver the clear title required

6    under within the contract.

7              And also as a -- a chapter 11

8    debtor-in-possession, there was no court authority

9    for the closings to occur ---

10       Q.    --- And -- and the close ---

11       A.    --- Post petition.

12       Q.    The closing under that original contract

13   was required to be on or before what date?

14       A.    It was January the 18th, 2007.  And I

15   remember discussing that initially with the lady in

16   Durham because I believe that fell on Martin Luther

17   -- it was a Monday.  It fell on Martin Luther King

18   Day.  And we had discussions about it.  The closing

19   date would -- would technically be the next day.  But

20   of course we knew that wasn't going to happen in any

21   event.  But I remember that's when the date fell.

22       Q.    Okay, and is -- does the original contract

23   have a time-is-of-the-essence provision?

24       A.    It does.

25       Q.    And when you say that -- I believe you

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 44

```
 1   referenced the debtor was not able to convey a good
 2   title under the provisions of the original contract
 3   that was required to be closed on January -- on or
 4   before January 18th, 2007, what are you referring to?
 5        A.   Well, specifically there was a cell tower
 6   -- encumbrance on the property with respect to a cell
 7   tower for the easement that existed with respect to
 8   the property.  I believe that's what the recorded
 9   document was actually called.  And that -- we could
10   not deliver it free and clear of that.  And -- and
11   they were going to use it as a church.  And initially
12   that was a problem for their configuration of the
13   property, and it affected their interest in the
14   property.
15        Q.   The -- at -- at any time did the church
16   acknowledge that it had lost its rights or forfeited
17   its rights under the $65,000 deposit that was paid in
18   connection with the Graham Realty contract document?
19        A.   No.  To the contrary, from it not be the
20   first conversation -- it would've been the second
21   conversation -- all the way up truly until the
22   post-petition contract was executed in May of 2007,
23   they were -- were consistent in asserting they had
24   the -- owned the rights to that deposit, and not the
25   debtor.
```

D&M Land Company, LLC       Hearing Transcript                    1/5/2010

Page 45

1        Q.    And because the debtor had not performed

2    under the contract?

3        A.    That was their position, yes.

4        Q.    Okay, and in fact the debtor did not close

5    the sale on or before January 18th, 2007.  Is that

6    correct?

7        A.    That's correct.

8        Q.    And in -- in fact the debtor -- the

9    original contract did not list as a permitted

10   exception to title the Crown cell tower encumbrance.

11   Is that correct?

12       A.    That is correct.

13       Q.    And in your experience as a -- as a

14   commercial real estate attorney, would the existence

15   of that Crown cell tower encumbrance be an

16   encumbrance of -- on the title?

17       A.    It would've been.  They could not have

18   gotten title insurance.  That would not have been

19   listed as a -- as a permitted exception.

20       Q.    And the contract itself did not allow that

21   as a permitted exception.

22       A.    That's correct.

23       Q.    And did the debtor ever ask the court to

24   approve or to assume the original Graham Realty

25   contract that had to close by January 8th, 2007?

Page 46

1        A.    No.

2        Q.    And -- and do you know why that didn't

3   occur?

4        A.    Because we -- we couldn't perform under

5   that contract.

6        Q.    Okay, and ---

7        A.    --- We being -- being -- we being the

8   debtor that we represented.

9        Q.    Okay, and were -- were you involved in

10  negotiations subsequent to the Chapter 11 filing with

11  Mr. Morton representing the church relating ---

12       A.    --- Yes.

13       Q.    And what kind of contact or negotiations

14  were involved?

15       A.    We had -- it seemed like for a while he

16  and I were speaking on a almost daily basis, whether

17  it be via telephone or -- or e-mail or -- or -- very

18  few written communications other than via telephone

19  or e-mail.  But we were communicating extensively

20  regarding what the terms of, hopefully, what the new

21  contract were going to be.

22       Q.    And the -- and in fact was a -- a new

23  post-petition contract arrived at with the church?

24       A.    Yes.  After four months of back and forth,

25  in May of 2007 that contract was executed.

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 47

1      Q.   Okay, and the -- and the new contract was

2   designated an amended and restated contract.  Is that

3   correct?

4      A.   That is correct.

5      Q.   It -- it -- it in fact had very

6   substantial and substantive differences than the

7   original contract, did it not?

8      A.   It did.  And -- and as I've mentioned --

9   and I believe Ms. Humrickhouse related to the Court

10   earlier -- the -- the buyers, Zion Temple, was an

11   African-American church.  And it was very important

12   to the pastor of the church who was handling the

13   negotiations in dealing with her congregation that

14   they be able to explain sort of what was going on,

15   why this was dragging out.

16           And it was important to them that we added

17   that language, really, at the request of their

18   attorney to pacify the congregation, not to have any

19   legal effect, but it was to better enable her to

20   explain to them what they were doing and who they

21   were dealing with, because they were dealing with

22   unsophisticated parishioners who just wanted to make

23   sure -- they were sort of all excited about the new

24   place to worship and they didn't want to convey the

25   impression to them that anything was changed.

D&M Land Company, LLC      Hearing Transcript                1/5/2010

Page 48

1       Q.   And -- but -- but in fact the original

2   contract was not -- was not closed and was not being

3   closed.

4       A.   That is -- that is correct.  The new

5   contract contained the permitted exceptions.  There's

6   a reference -- there's an exhibit B that references

7   permitted exceptions which refers you back to

8   paragraph six of the contract which express --

9   expressly permits the cellphone lease easement to --

10  to be a permitted exception.

11          And that was one of the bones of the

12  negotiation.  We had to convince the church that it

13  still made sense for them to buy it with that

14  encumbrance on the property.

15      Q.   And -- and -- and that -- that permitted

16  -- new permitted encumbrance relating to the cell

17  tower which was the subject of the negotiation is

18  specifically set out not just on the exhibit but in

19  the context of a particular paragraph -- is it five

20  or six?

21      A.   Paragraph six, yes.

22      Q.   Paragraph six.  And can you read the --

23  that provision, please -- or at least the one that

24  relates to the permitted exception.

25      A.   Buyer expressly acknowledges the existence

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 49

1    of a continuing lease and/or easement with Crown

2    Capital South, comma, Inc., and in parenthesis, and

3    any related entities or other entities having a

4    recognizable interest, close parenthesis, relating to

5    the existing cellular phone tower located on the

6    property.  And that is defined as the cell tower

7    lease, slash, easement.

8            The provisions of this paragraph, comma,

9    the exceptions set forth on exhibit B attached

10   hereto, and any exceptions relating to the cell tower

11   lease, slash, easement are hereinafter collectively

12   referred to as the permitted exceptions as the terms.

13       Q.   And that post-petition contract is -- has

14   what -- bears what date?

15       A.   It is dated effective as of May 9th, 2007.

16       Q.   Are you aware that the church filed a

17   proof of claim -- I think the word is used sort of as

18   a -- a -- a place-holding proof of claim -- prior to

19   May 9th, 2007?

20       A.   I am.  And I remember that due to the

21   discussions with the church, during that intervening

22   time period.  And I sort of interpreted that to be a

23   sort of leverage tool by them to sort of further

24   cement their assertions that they were entitled to

25   the $65,000 return for their deposit.

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 50

1        Q.   And was there a concern that the church

2    might also assert damages for the debtor's failure to

3    comply with the original contract?

4        A.   Yes, that was the threat in the

5    negotiations.  Threat may be too strong a word.  It

6    was mentioned, or suggested, as part of the ongoing

7    discussions.

8        Q.   And the -- the new contract specifically

9    says, does it not, that it is -- it supersedes the

10   original contract?

11       A.   Yes, it does.

12       Q.   And what -- what became of -- or how --

13   what became of the $65,000 pre-petition deposit under

14   the original contract?

15       A.   It was, in effect, returned to Zion

16   Temple.  And Zion Temple repaid it back to the debtor

17   as earnest money under the new contract.

18       Q.   There was -- well, what language was used

19   to accomplish that?

20       A.   If you look at subparagraph 2A on page one

21   of the -- the new contract, buyer specifically

22   consents to the transfer by the escrow agent as

23   defined below -- which is Graham Realty -- of the

24   65,000 in earnest money under the initial contract to

25   the earnest money deposited in accordance with the

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 51

1    provisions of this paragraph.

2                    And that was intended to avoid the

3    eviction of the debtor as they were adamantly main --

4    asserting their rights in the initial 65,000, handing

5    a check back, and then a check being -- a new check

6    being delivered to the -- to the debtor.  It was

7    accomplished via the language in the contract.

8        Q.   The -- the language in the new contract

9    that -- that has some acknowledgment by the buyer

10   that in effect the Chapter 11 debtor hadn't done

11   anything wrong -- are you familiar with that

12   language?

13       A.   Yes.

14       Q.   And where does that language appear in

15   that new contract?

16       A.   The language appears in paragraph five at

17   the bottom of page two.  Buyer specifically

18   acknowledge and agrees that seller has performed all

19   of its obligations under the initial contract and

20   that seller is entitled to the earnest money deposit,

21   comma, upon beach by buyer -- comma, upon breach by

22   buyer, comma, or the closing of this transaction,

23   comma, free of any or all claims of the buyer.

24                    And it's important to -- to read that in

25   the context of the defined terms.  The earnest money

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 52

1    deposit as it is defined in this new contract is the

2    $70,000 deposit.  It is not the initial $65,000

3    earnest money deposit.  And that's defined in the

4    very first sentence of subparagraph 2A.

5              So what paragraph five did was acknowledge

6    not the debtor's entitlement to the old earnest money

7    deposit.  It was the debtor's entitled to the new

8    earnest money deposit upon either a breach or

9    closing.

10             And what the -- the reason for the

11   reference to the initial contract was to -- as has

12   been pointed out earlier today, made clear that there

13   were no prior claims under the old contract where

14   they could come back at the closing table and say,

15   well, we're -- we've got some claim we need to deduct

16   the purchase price, or what have you.

17             But if you look at the defined terms, it's

18   clear what earnest money deposits that sentence

19   refers to.

20        Q.   At the time that you were negotiating with

21   Mr. Morton, if -- if you recall, did you consider

22   that you were negotiating a new contract for -- for

23   the church and for the debtor's sale of the property?

24        A.   Yes.

25        Q.   And -- and that there was going to be a --

D&M Land Company, LLC        Hearing Transcript                      1/5/2010

Page 53

1   in effect a new deposit, as you described, in

2   connection with the new contract.

3           A.    Yes.

4           Q.    And it is in fact that new contract that

5   was presented to the Court for approval.

6           A.    That's the only contract that I'm aware of

7   that was presented to the Court for Zion Temple for

8   approval.

9                 MR. CRAMPTON:  If Your Honor please,

10  if I -- I -- I should have done this in advance.  And

11  I apologize.

12                I'd like to mark the two exhibits that Mr.

13  Sink has referred to and get him to then re --

14  identify them again so that I can offer them into

15  evidence.

16                (* Exhibit 1 was marked *)

17                (* Exhibit 2 was marked *)

18          Q.    (Mr. Crampton)  Mr. -- Mr. Sink, the --

19  the clerk has now marked the two contracts that you

20  have been referring to earlier.  And one of them we

21  referred -- you referred to as the original -- we

22  referred to as the original contract that was on the

23  Graham Realty logo.  Which exhibit is that?

24          A.    That's the one marked as Exhibit 1.

25          Q.    So Exhibit 1 is -- would it be correct --

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 54

1    all your references to the original contract or the

2    contract under -- on the Graham Realty logo is

3    Exhibit 1.  Is that correct?

4         A.   That is correct.

5         Q.   Okay, and the other contract that you

6    referred to as the new contract, the amended,

7    restated contract, the superseding contract, that's

8    now marked as Exhibit 2.  Is that correct?

9         A.   That is correct.

10                   MR. CRAMPTON:  If Your Honor please,

11   that's all the questions I have.  Thank you.

12                   THE COURT:  All right, thank you.

13             Questions?

14                   MR. BRUTON:  Well, not right now,

15   Your Honor, no.  I'd like Mr. Sink to be subject to

16   recall on a day when we can discuss these general

17   intangible issues in further detail should it be

18   necessary.

19                   MS. HUMRICKHOUSE:  Your Honor, may

20   -- if Mr. Bruton is finished, may I be just heard on

21   that -- on that one point at some point when it's

22   convenient for the Court -- as to whether or not this

23   is some new event -- this general intangibles.  It's

24   part of the confirmed plan in this case.

25                   I don't quite understand the surprise of

D&M Land Company, LLC       Hearing Transcript                    1/5/2010

Page 55

 1   Mr. Bruton that is being argued.

 2                    MR. BRUTON:  Well, the surprise is

 3   you filed a pleading at six o'clock yesterday

 4   evening.  You filed a previous response and it wasn't

 5   raised.

 6                    MS. HUMRICKHOUSE:  And -- and I

 7   don't think that -- unless there's a local rule that

 8   I'm not aware of in the Middle District -- and for

 9   that I apologize -- I'm not sure that arguments are

10   -- you must state all of your arguments in your

11   pleadings.  And -- and we -- and -- and the only

12   reason that we -- that we did it was because it's

13   part of the plan.

14                    You had knowledge of -- I don't mean to be

15   talking directly to you.  But I believe that BB&T had

16   full knowledge of the provisions of the plan.  They

17   negotiated them.  And this is not a surprise tactic.

18   This is just part of the pleadings in the case, just

19   like any other pleading that we would -- we would do.

20                    So I don't acknowledge that there is a

21   necessity for some additional time to be able to

22   argue what Mr. Bruton has already said was part of

23   his first response and that he was perfectly prepared

24   to make that argument and then decided he didn't need

25   to.

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 56

1                          MR. CRAMPTON:  It -- I'm sorry, Your

2      Honor.  I'm uncertain as to whether or not Mr. Bruton

3      had further questions of Mr. Sink.  I do -- I do

4      intend at -- at the appropriate time, if he's

5      finished, to ask that the Debtor's Exhibits 1 and 2,

6      being the original contract and the new post-petition

7      contract, be admitted into evidence.

8                          MR. BRUTON:  I don't have any

9      objection to that.

10                         THE COURT:  All right, I'll admit

11     them.

12                             EXAMINATION

13     BY THE COURT:

14         Q.   Mr. Sink, when I look at your time records

15     that I have because of your 506(b) fee application,

16     they all refer to purchase agreement modifications,

17     revisions, contract amendments and modifications.

18             If -- if it was the intention to have a

19     new contract, can you explain to me why all of your

20     time entries are phrased review of proposed contract

21     modifications and revisions to the same.

22         A.   Yes, Your Honor.

23             In -- as I said earlier, in my discussions

24     with counsel for Zion Temple, that is how they were

25     phrased.  And -- and quite frankly, I lapsed into the

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

 1   colloquialism he was using, calling it a modification

 2   or amendment, because that was important to his

 3   client, in not a legal sense, but in the colloquial

 4   sense.  And that was the -- my only recollection of

 5   it.

 6            I don't remember thinking about time

 7   entries two and a half years ago -- I guess almost

 8   three years later, Your Honor.  But it came to the

 9   court.  That's my -- that's my only recollection or

10   explanation for that.

11       Q.   And did you review the drafter of this

12   agreement or the primary drafter of what's been

13   marked as exhibit B?

14       A.   Yes, Your Honor.

15       Q.   Okay.

16                 THE COURT:  Other questions?

17                 MR. CRAMPTON:  No, Your Honor.

18                 THE COURT:  All right.  Thank you.

19                 THE WITNESS:  Thank you.

20                 MS. HUMRICKHOUSE:  I guess we look

21   for guidance, probably Mr. Bruton and I both, as to

22   how you want to handle a -- a lot of the rest of the

23   arguments I think made by both Mr. Bruton and I have

24   to do with whether or not a security interest is

25   found by the Court on the 552(b)(1)'s and the

D&M Land Company, LLC       Hearing Transcript                    1/5/2010

Page 58

 1   506(c)'s.  And I don't know whether -- how you -- how

 2   the Court would like to handle that.

 3               And -- and I'm not sure whether Mr.

 4   Bruton's even ---

 5                       MR. BRUTON:  --- Well ---

 6                       MS. HUMRICKHOUSE:  --- Had a chance

 7   to argue that yet.  So....

 8                       MR. BRUTON:  Well, I -- I just have

 9   a couple of responses to some things Ms. Humrickhouse

10   had to say.

11                       THE COURT:  Okay.

12                       MR. BRUTON:  First of all, I think

13   Your Honor hit the -- the nail on the head with

14   respect to the plan treatment.  When I was reviewing

15   their response yesterday, I got out my yellow pen and

16   I highlighted the exact same line that you quoted

17   from.  And that's the only page that that yellow line

18   is on, Your Honor, so I think that is the -- the

19   linchpin.

20               Ms. Humrickhouse stated that she didn't

21   believe that Judge Small -- that Judge Small's cash

22   collat -- collateral order allowing the re-visitation

23   of the disgorgement issue would still be enforceable

24   absent some pro -- provision in the plan.  I wholly

25   -- wholeheartedly disagree with that statement.

D&M Land Company, LLC       Hearing Transcript                    1/5/2010

```
 1                  She spoke about how no motion for lift

 2     stay had ever been filed.  Yeah, that's a -- and I'm

 3     not sure why that's relevant but, yeah, that's true.

 4     But everybody thought the property was worth 6.5

 5     million dollars based on these contracts with Zion

 6     Church.  You know, a -- a motion to lift stay under

 7     those -- those circumstance would've had a -- the

 8     same chance as a ice cube in hell, Your Honor.

 9                  Let's see here.  They speak about the

10     debtor defaulted on the contract because it didn't

11     close before 1-18.  Well, it couldn't have closed

12     before 1-18 because of the bankruptcy filing on 1-10,

13     Your Honor.  It -- it simply couldn't have happened.

14                  Oh, and -- and going back to this -- this

15     first line in the plan lang -- language, Ms.

16     Humrickhouse revealed that -- referred to the term as

17     real property.  BB&T shall retain its first deed of

18     trust interest on the debtor's real property as

19     described in that deed of trust, etcetera.

20                  Well, we also retained the proceeds of the

21     real property, Your Honor.  And this deposit is the

22     proceeds of that real property.

23                  And I'm not going to comment on Old -- Old

24     -- Old -- Old Stone Bank.  I think that case is

25     clearly applicable to the facts of this case.
```

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 60

1                    THE COURT:  Ms. Humrickhouse, will

2      you be needed if the Court were to rule in your favor

3      for the 506(b) hearing?

4                    MR. BRUTON:  506(c)?

5                    MS. HUMRICKHOUSE:  I'm -- I'm ---

6                    THE COURT:  --- 506(c).  Excuse me.

7                    MS. HUMRICKHOUSE:  I'm thinking

8      about it.  I -- I -- I -- if there would be any --

9      candidly, probably not.  I mean, I think that our

10     506(c) argument, Your Honor, is made from our fee

11     applications and the monthly reports of the debtor

12     and the financial records of our trust account, which

13     can be presented through other members of the firm.

14                   THE COURT:  All right.

15                   And, Mr. Bruton, do you just want to stand

16     on your brief?  I realize in the first place you

17     claim you never get to that point because you have

18     the proceeds.

19                   But, secondly, you've also argued that

20     there was no benefit ---

21                   MR. BRUTON:  --- Right.

22                   THE COURT:  --- To the estate --

23     which I understand that legal argument.

24                   MR. BRUTON:  Right.  Yeah, I -- I

25     stand on my brief.  That's fine.  I don't know if you

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 61

1    -- I understand you don't want to have another --

2    have another hearing.

3              I -- I've glanced over the -- the time

4    entries.  There's a -- there's a couple in specific

5    that I have some problems with.  But -- but more

6    generally with respect to exhibit C which ---

7                    THE COURT:  --- Well, now they're

8    contending they're not entitled to the 132.  They're

9    -- they would only be entitled to the 65.

10                   MR. BRUTON:  Well -- well, I think

11   ---

12                   MS. HUMRICKHOUSE:  --- That's

13   correct.  The -- the -- the confirmed plan limits us

14   to only asserting 506(c) expenses by way of set-off

15   to a found security interest in that 65.

16                   MR. BRUTON:  Well -- well, right.

17   Well, that's a given.  But I ---

18                   MS. HUMRICKHOUSE:  --- Oh, I'm

19   sorry.  I thought I was responding ---

20                   MR. BRUTON:  --- I think we're

21   talking ---

22                   THE COURT:  --- Oh, I'm sorry.  I

23   got ---

24                   MR. BRUTON:  We're talking numbers

25   here now.

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 62

1                   THE COURT:  Right.  Okay.

2                   MR. BRUTON:  I think their -- I

3       think their assessment would be that, well, their

4       total amount of the fees is 132 and the $65,000 comes

5       off the top to pay them -- I -- I assume would be

6       their position.

7                   THE COURT:  I believe that's

8       correct.

9                   MR. BRUTON:  Right.  So ---

10                  MS. HUMRICKHOUSE:  --- Our -- our

11      position is that there are beaucoup of 506(c) charges

12      that can be used to set off the 65 including the

13      insurance and maintenance and other actual

14      expenditures made from unencumbered funds of the

15      debtor ---

16                  MR. BRUTON:  --- Okay, I -- I -- I

17      ---

18                  MS. HUMRICKHOUSE:  --- That are on

19      the exhibit -- I believe -- D or C?  I'm sorry ---

20                  MR. BRUTON:  --- Well, all right.

21      Well, let's ---

22                  MS. HUMRICKHOUSE:  --- D ---

23                  MR. BRUTON:  --- All right, let's

24      start with the expenses, all right, which is exhibit

25      D.

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 63

```
 1                     MS. HUMRICKHOUSE:  Yes.

 2                     MR. BRUTON:  Those have been paid --

 3      or can I ask her some questions or....

 4                     MS. HUMRICKHOUSE:  I'm -- I'm fine

 5      with that ---

 6                     MR. BRUTON:  --- Is that ---

 7                     MS. HUMRICKHOUSE:  --- If it's all

 8      right with you.

 9                     MR. BRUTON:  Okay.  Those have all

10      been paid -- correct -- for starters?

11                     MS. HUMRICKHOUSE:  Those have been

12      paid by either the debtor from unencumbered funds ---

13                     MR. BRUTON:  --- All right.

14                     MS. HUMRICKHOUSE:  --- And shown on

15      the monthly reports ---

16                     MR. BRUTON:  --- Okay.

17                     MS. HUMRICKHOUSE:  --- Or they have

18      been advanced by the law firm of Nichols and Crampton

19      in order to have -- in -- in order to get them paid

20      -- for insurance and that sort of thing.

21                     MR. BRUTON:  All right, okay.

22                     MS. HUMRICKHOUSE:  And which were

23      then run through.

24                     And we have -- we have $35,000 worth of

25      unpaid fees that are approved ---
```

Page 64

1                          MR. BRUTON:  --- All right.  Well,

2        let ---

3                          MS. HUMRICKHOUSE:  --- In this case.

4                          MR. BRUTON:  --- Let's go ahead.

5                  The unencumbered funds, what are those?

6                          MS. HUMRICKHOUSE:  The debtor had

7        income that it ---

8                          MR. BRUTON:  --- Rent from the cell

9        tower.

10                         MS. HUMRICKHOUSE:  Right.  In which

11       ---

12                         MR. BRUTON:  --- Which was ---

13                         MS. HUMRICKHOUSE:  --- In ---

14                         MR. BRUTON:  --- BB&T's cash

15       collateral.

16                         MS. HUMRICKHOUSE:  In which ---

17                         MR. BRUTON:  --- No.

18                         MS. HUMRICKHOUSE:  --- The BB&T

19       never claimed a security interest.

20                         MR. BRUTON:  It's not our job to --

21       you're -- it's -- it's -- well, it's the debt -- Your

22       Honor, the debtor incurred income from a leased

23       tower.

24                         THE COURT:  Okay.

25                         MR. BRUTON:  That income is subject

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 65

1    to the rents of BB&T.  My understanding standing here

2    today is that those monies were used to pay -- pay

3    these expenses.  No motion to use cash collateral was

4    ever drafted.  No order was ever entered.  But that's

5    what -- what was done.  But BB didn't -- BB&T didn't

6    complain about it.  But they can't come back now and

7    charge BB&T again for the same expenses.

8                        MS. HUMRICKHOUSE:  The confirmed

9    plan did not retain the right of those -- those

10   security interests in those funds.  The confirmed

11   plan ---

12                        MR. BRUTON:  --- The funds were

13   already spent.

14                        MS. HUMRICKHOUSE:  The confirmed --

15   no, not ---

16                        MR. BRUTON:  --- Well, okay.  All

17   right, all right, okay, okay.

18                        MS. HUMRICKHOUSE:  I'm -- I'm sorry.

19   I don't mean to argue with counsel.  But ---

20                        MR. BRUTON:  --- But -- all right,

21   okay.

22                        MS. HUMRICKHOUSE:  --- That's not

23   true.

24                        MR. BRUTON:  That's -- that's point

25   number one.

D&M Land Company, LLC        Hearing Transcript                1/5/2010

Page 66

```
 1                  Point number two is, going back to exhibit

 2      D, a lot of these expenses are incurred after January

 3      '08 where -- when Zion Church was out of the picture.

 4      In fact in the cash collateral motion that was filed

 5      by the debtor I think in -- I think it was October

 6      originally -- they stated that Zion Church has

 7      already forfeited -- I think it was $116,000.  So

 8      they can't go and assess fee -- I mean, really all

 9      we're talking about is Zion Church money.

10                  They can't go in and assess fees and

11      expenses after Zion Church is out of the picture,

12      Your Honor, and so that would apply to -- on exhibit

13      D, any expense incurred after January 8th.

14                  Likewise with respect to ---

15                  THE COURT:  --- Now, explain that to

16      me again.

17                  MS. HUMRICKHOUSE:  Yeah.  I don't

18      get that either.

19                  THE COURT:  I don't -- I'm -- I'm

20      not sure I'm following you.

21                  Zion Church is out of ---

22                  MR. BRUTON:  --- They want -- they

23      -- they want to charge ---

24                  THE COURT:  --- Zion's out of the

25      picture ---
```

D&M Land Company, LLC     Hearing Transcript                    1/5/2010

Page 67

1                        MR. BRUTON:  --- The $65,000 under

2      506(c).  In order to do so, they have to show that

3      their expenses were reasonable and necessary in

4      obtaining the $65,000.  That's -- they -- they want

5      to charge that.  That's the property they -- they

6      want to charge.

7                        THE COURT:  I understand that.

8                        MR. BRUTON:  So they have to say --

9      show that their expenses and fees are necessary with

10     respect to the collection of that money -- which

11     terminated ---

12                       THE COURT:  --- I -- why do they

13     have to show it with respect to that particular

14     money?

15                       MR. BRUTON:  Because that's the

16     money they want to charge.  They can't -- they can't

17     go out -- they can't say -- they -- they can't say

18     we've -- you know, we -- we did this and we generated

19     X money and we -- and BB can say -- BB&T says, well,

20     that's our collateral.

21         Then the debtor says, well, we also did

22     this.  It had nothing to do with generating this

23     money.  But we want to charge these fees and expenses

24     to this collateral -- although they had nothing to do

25     with this piece of collateral, the $65,000 deposit by

D&M Land Company, LLC       Hearing Transcript                    1/5/2010

Page 68

 1   Zion Church.

 2              They can't possibly show that anything

 3   they did was reasonably and necessary with respect to

 4   this deposit if it in -- if it was incurred after a

 5   time that that deposit was forfeited.  So that's

 6   where we get to the exhibit D and the expenses after

 7   January.

 8              Like -- likewise with respect to exhibit

 9   C, all these -- let's see here -- if I can figure out

10   which one is exhibit C.

11                    MS. HUMRICKHOUSE:  It would be the

12   last fee application.

13                    MR. BRUTON:  All the expenses there

14   were generated well after Zion Church was out of the

15   picture and the monies were forfeited.

16              Likewise on exhibit B, the first couple of

17   time entries deal -- do -- do deal with Zion -- Zion

18   Church -- the first -- I don't know -- $2,500.  But

19   as you turn to the next pages, well, then they start

20   dealing with the sale of South Bridge.  The South

21   Bridge sale, of course, never materialized.  Any

22   expenses incurred dealing with South Bridge, or

23   anybody else for that matter, wouldn't be chargeable

24   against the $65,000 deposit forfeited by Zion Church.

25   So it's BB&T's position that exhibit C is essentially

D&M Land Company, LLC        Hearing Transcript                      1/5/2010

Page 69

1   out of the equation as is most of exhibit B.

2              There are a couple of minuscule time

3   entries on exhibit A.  I don't know if you want to

4   get into the details of that nature here and now.

5   But there are a few time entries that I would object

6   to.

7              THE COURT:  Okay, just so I

8   understand what you're saying, it's your contention

9   that no expenses are available for consideration

10  under 506(c) after Zion Church is out of the picture.

11             MR. BRUTON:  That's correct.

12             THE COURT:  Okay.

13             MR. BRUTON:  Because it -- it didn't

14  -- their efforts didn't -- weren't necessary to the

15  benefit of BB&T in that regard, because the -- the

16  money was already there and forfeited.

17             And that's why in my brief I -- you know,

18  I picked out of the thin air $75,000.  Well, if you

19  run the number -- if you use exhibit A, it's $69,000,

20  and a couple of time entries from exhibit B, you're

21  pretty close to 75 -- $75,000.  And I just picked

22  that out of the thin air.

23             But -- so again, you have $183,000

24  collected.  They want to pay their 75.  That's fine.

25  There's still 110 grand left over.  Well, we want our

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 70

1    65.  That's fine.  And there's still $40,000 to go

2    around.

3                        THE COURT:  There's no money in this

4    case.

5                        MR. BRUTON:  Well, there's no money

6    -- well, you're right.

7                        THE COURT:  This -- this ---

8                        MR. BRUTON:  --- Today there's no

9    money.  That ---

10                       THE COURT:  --- No money.  They're

11   in the hole.  It's just how much ---

12                       MR. BRUTON:  --- That's true.

13   That's true.

14                       THE COURT:  --- Bigger the hole ---

15                       MR. BRUTON:  --- But when you're

16   talking about ---

17                       THE COURT:  --- Is getting.

18                       MR. BRUTON:  --- Taking money out of

19   the -- the secured creditor's hands ---

20                       THE COURT:  --- I understand.

21                       MR. BRUTON:  All right.

22                       THE COURT:  All right.  But I just

23   don't want you to be laboring under the impression

24   that there's still a pot of money out there.

25                       MR. BRUTON:  No, you're right.

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 71

```
 1                    THE COURT:  Okay.

 2                    MR. BRUTON:  There's no money.

 3   That's right.

 4                    MS. HUMRICKHOUSE:  Your Honor, I'm

 5   either confused or I violently disagree with the

 6   506(c) analysis Mr. Bruton just gave.

 7                    506(c) allows the -- a party to charge

 8   against collateral of the -- the secured party.  Now,

 9   there's -- we all realize that the -- the land --

10   which isn't there anymore -- was collateral.  And as

11   -- as long as the -- the expense -- the charges were

12   used to preserve or help in the disposition of any of

13   the collateral, then it is a proper 506(c) expense,

14   if it's reasonable and -- and -- and -- and on -- and

15   on the other conditions of 506(c).

16                    So I'm not understanding or accepting the

17   limitation that Mr. Bruton is placing on it that all

18   of -- that any 506(c) charges would have to be

19   related to the Zion Temple contract.

20                    We had -- what we were doing was marketing

21   the property pursuant to the plan at the request of

22   BB&T and these charges were related to that marketing

23   effort.  And they in fact were required by the -- the

24   plan and they exceeded the $65,000.

25                    THE COURT:  Okay, and this was
```

D&M Land Company, LLC     Hearing Transcript                1/5/2010

Page 72

1   vacant land.

2                 MS. HUMRICKHOUSE:  No, no, Your

3   Honor.  This -- this piece of property is ---

4                 THE COURT:  --- 18 acres on Glenwood

5   Avenue.

6                 MS. HUMRICKHOUSE:  It's on -- it's

7   on 70, kind of between Raleigh and Durham, right

8   almost where Briar Creek is.

9                 THE COURT:  Okay.

10                 MS. HUMRICKHOUSE:  And it has a very

11   large building on it that was -- was built for the

12   purpose of being a boat showroom.

13                 THE COURT:  Oh, okay, all right.

14                 MS. HUMRICKHOUSE:  And so therefore

15   it was a great place -- or -- or at least these --

16   these churches who were interested in it believed it

17   was a great place for their congregations.  So it was

18   in fact improved land.

19                 THE COURT:  All right.

20                 MS. HUMRICKHOUSE:  That was -- had

21   to be insured, maintained, a security system, which

22   required the electricity and the utilities to be kept

23   on, which the debtor funded.

24                 THE COURT:  Well, these insurance

25   costs are exorbitant.

D&M Land Company, LLC        Hearing Transcript                1/5/2010

Page 73

1                    MS. HUMRICKHOUSE:  Yes -- because it

2       is a very large building.

3                    THE COURT:  What kind of insurance

4       did you have?

5                    MS. HUMRICKHOUSE:  Well, they filed

6       insurance reports with the -- with the -- it was --

7       it was a large amount of money per year.  It was a

8       huge building.

9                    MR. CRAMPTON:  It was an amount --

10      it was insured in an amount, Your Honor, required by

11      BB&T.

12                   THE COURT:  That's ---

13                   MR. CRAMPTON:  --- Mr. Bruton knows

14      that.  Mr. Pitt knows that.  It was an amount -- and

15      we had to verify to their attorneys and to BB&T that

16      it was an -- insured for that specific amount.  I

17      don't recall the specific amount.  But it was an

18      amount required by BB&T.

19                   MS. HUMRICKHOUSE:  Who was a loss

20      payee, of course, on the policy.

21                   THE COURT:  Right.  I understand

22      that.  Okay.

23                   MS. HUMRICKHOUSE:  And -- and

24      obviously, Your Honor, we -- we have checks that

25      would support each and every one of those insurance

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 74

1    premium payments.

2                    THE COURT:  But you made like one in

3    March, two in May.

4                    MS. HUMRICKHOUSE:  Well, what

5    happened was that the debtor was put on a quarterly

6    payment and sometimes missed it and had to make it

7    up.  And it was never forced insured by BB&T.

8                    THE COURT:  Okay.

9                    MS. HUMRICKHOUSE:  But -- but with

10   regard to Mr. Bruton's position that these expenses

11   have to be related to the Zion, we disagree.  We

12   think any expenses that were used to preserve the

13   collateral -- and at the time -- until March of 2008

14   there was a very large piece of collateral sitting on

15   Highway 70.  And anything that we -- I think that was

16   when the auction was finalized -- in -- in March of

17   2008.

18          So anything up to that point we were

19   trying to market and sell it at the request of BB&T,

20   who knew that there were no other means of paying for

21   these marketing efforts.

22                    THE COURT:  How much money did you

23   get from the lease of the cell tower?

24                    MS. HUMRICKHOUSE:  I believe it was

25   $1,500 a month, Your Honor.

D&M Land Company, LLC      Hearing Transcript                1/5/2010

```
 1                     THE COURT:  Okay.

 2                     MR. BRUTON:  I think -- I think it

 3      was a little less.  It's all -- it's all in the

 4      monthly reports.

 5                     THE COURT:  Okay.

 6                     MS. HUMRICKHOUSE:  Yeah, it's in the

 7      monthly reports.  And I -- and I can grab that.

 8                     THE COURT:  All right.

 9                     MS. HUMRICKHOUSE:  But I believe it

10      was....

11                     MR. CRAMPTON:  Which number are we

12      looking for?

13                     MS. HUMRICKHOUSE:  We're looking at

14      the cell -- the income number.

15                     THE COURT:  Is that the only income

16      that was generated?

17                     MS. HUMRICKHOUSE:  Yes, Your Honor.

18          I -- I -- you -- Mr. Bruton is correct.

19      It is 1,150.

20                     THE COURT:  Okay.

21                     MS. HUMRICKHOUSE:  Per month.

22                     THE COURT:  And what was the last

23      month that was paid?  Did that go all the way to

24      April '09?

25                     MS. HUMRICKHOUSE:  I -- I will find
```

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 76

1   that out for you in one second.

2                        MR. CRAMPTON:  If Your -- Your Honor

3   please, after the auction sale that was a required

4   provision of the confirmed plan, and while there were

5   many bidders present, BB&T ended up being the high

6   bidder.  I think it then turned around and

7   immediately resold it to who their second bidder was

8   at -- at the auction.

9                   But subsequent to that time, and in

10  conjunction with the closing, I did have contact with

11  Mr. Pitt in connection with forwarding checks that

12  were still being received by the debtor after the

13  closing date to Mr. Pitt.  And then I think they made

14  arrangements for those payments to be paid directly

15  to the -- the purchasing entity, which was, I think,

16  a special purpose entity set up by the bank.

17                       THE COURT:  And when was your

18  closing date?

19                       MS. HUMRICKHOUSE:  It -- the -- the

20  closing was in March of 2009.

21                       THE COURT:  Okay, so that would make

22  sense.  As the last utility charges are April, it

23  would be ---

24                       MR. BRUTON:  --- The -- the closing

25  was right around the end of March or beginning of

D&M Land Company, LLC        Hearing Transcript                1/5/2010

Page 77

1    April.

2                    MS. HUMRICKHOUSE:  Right, right.

3                    THE COURT:  Okay.

4                    MS. HUMRICKHOUSE:  So that would

5    make sense.

6            Obviously, we weren't paying any of the

7    utilities or insurance after we conveyed title.

8                    THE COURT:  Right.  Okay, so we can

9    assume therefore probably from April 2009 forward the

10   cell phone tower money went directly to BB&T.

11                   MS. HUMRICKHOUSE:  Or any subsequent

12   purchaser that ---

13                   THE COURT:  --- Right.

14                   MS. HUMRICKHOUSE:  Yes, yes.

15                   THE COURT:  Okay, to a third party.

16           Okay, so we're just interested in filing

17   through March of 2009.

18                   MS. HUMRICKHOUSE:  That's correct,

19   Your Honor.

20                   THE COURT:  All right.  Anything

21   else?

22                   MR. BRUTON:  There -- there are

23   cases -- cases cited in my brief regarding the

24   after-the-fact energies -- well, in fact one case,

25   the debtor was trying to sell some property, didn't

D&M Land Company, LLC          Hearing Transcript                    1/5/2010

Page 78

1    sell, auctioned the property.  Debtor's counsel

2    sought 506(c) expenses for the sale that failed --

3    fail -- failed as well as for the auction.

4    Bankruptcy court said you get it from the auction.

5    There's no benefit from a sale that fails.  You don't

6    get it for that.

7              And frank -- and, frankly -- and this is

8    probably relevant -- we paid Mr. Crampton's fees

9    associated with the auction.  And as part of the

10   closing, we were required to pay the auctioneer a

11   prior lien, and I think we paid their firm like

12   $14,000 associated with the auction.

13                  MR. CRAMPTON:  Now, the -- that is

14   correct about the payment.  It's incorrect about the

15   characterization.

16              This was not a 506(c) assessment.  It was

17   ---

18                  MR. BRUTON:  --- That -- that's

19   right.

20                  MR. CRAMPTON:  --- A required

21   expense under the terms of the consensual plan that

22   was there must be an auction and -- and if there's an

23   auction, there must be paid the auctioneer fees and

24   expenses and the attorney fees connected with that

25   closing.  So there was no 506(c) motion.

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

 1                          MR. BRUTON:  That's right.  That's

 2    right.

 3                          MR. CRAMPTON:  There was no 506(c)

 4    assessment.  It was entirely required by and

 5    consistent and pursuant to the confirmed plan terms.

 6                          THE COURT:  All right.  Anything

 7    else?

 8                          MR. BRUTON:  I don't believe so.

 9                          THE COURT:  All right.  I'll issue a

10    ruling as soon as I can.

11                          MS. HUMRICKHOUSE:  Excuse me, Your

12    Honor. Can I -- I -- I -- we did not deal with the

13    506(c) arguments that were made by Mr. Bruton as far

14    as the -- we -- we brought your attention in our

15    pleading to the fact that there was no benefit to the

16    debtor.  The primary benefit of the marketing scheme

17    was for BB&T, because the confirmed plan did not

18    allow any of the proceeds to go to the shareholder.

19                      And I wanted -- and -- and a lot of the

20    cases that are relied upon by Mr. -- Mr. Bruton,

21    especially the 552(b)(1) cases and the five -- the --

22    of -- of Mr. -- of Judge Stocks and the Latham case

23    and the Mamo case, all deal with whether or not there

24    is a -- a -- a -- there is a primary and direct

25    benefit to the secured creditor.  And -- and the

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 80

```
 1   courts do not allow the 506(c) expenses if this

 2   benefit or this marketing effort that is going on is

 3   really just for the benefit of shareholders or the

 4   debtor itself.

 5               I want to make clear to Your Honor that in

 6   this case there was no benefit.  The -- the plan

 7   provided that any equity would actually be paid to

 8   BB&T and GE as -- as -- as part of the liquidating

 9   trust.

10               MR. BRUTON:  Which is a true

11   statement.  But that arose as a result of the

12   mediation.  And they attach a copy of the mediation

13   report or ---

14               THE COURT:  --- That's the 70-30

15   split.

16               MR. BRUTON:  Which -- which was

17   signed ---

18               THE COURT:  --- All right.

19               MR. BRUTON:  --- In December 2007,

20   which was one month -- or right about the same time

21   that Zion Church was out of the ball game anyhow.

22               So the -- the -- there was a deal that

23   essentially the stake holders forfeited their

24   interests ---

25               THE COURT:  --- Right.
```

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 81

 1                    MR. BRUTON:  --- To BB&T and GE.

 2               Well, that was struck in December '07 when

 3      -- and after the point that they had filed the cash

 4      collateral motion acknowledging that Zion Church had

 5      forfeited their right to the deposit anyhow.

 6                    MS. HUMRICKHOUSE:  But not prior to

 7      massive efforts on the part of debtor and debtor's

 8      counsel to continue to market the property.

 9                    MR. BRUTON:  I'll admit you -- you

10      all did a good job marketing the property.

11                    MS. HUMRICKHOUSE:  You just don't

12      want to pay us for it, huh?

13                    MR. BRUTON:  Well, anyhow....

14                    THE COURT:  All right, anything

15      else?

16               I don't want to not give anyone the

17      opportunity to say something.  If you want to confer

18      and come back in five minutes and then say something

19      else, I'm fine with that, so....

20                    MS. HUMRICKHOUSE:  Do you want to do

21      that?

22               Just -- if you don't mind, Your Honor, if

23      you could give us a few minutes just to see if

24      there's anything else we'd like to place on the

25      record, we'd appreciate it.

D&M Land Company, LLC      Hearing Transcript                    1/5/2010

Page 82

1                    THE COURT:  That will be fine.

2              All right, we'll take a recess.

3          (12:45-12:53 p.m. - recess)

4                    MS. HUMRICKHOUSE:  Your Honor, thank

5    you for the opportunity to discuss it.

6              But the only thing that we'd like to do is

7    that to the extent necessary -- and I'm not sure it

8    is necessary -- we'd ask the Court to take judicial

9    notice of the pleadings that we have in -- in -- in

10   the case, such as the order -- Judge Small's order,

11   the confirmed plan, the third modification.

12              I'm not sure that's necessary, but to the

13   extent that it is, we'd like you to take judicial

14   notice of it.

15                    THE COURT:  I certainly will.

16                    MS. HUMRICKHOUSE:  Thank you.

17                    THE COURT:  All right.

18              Mr. Bruton, anything further?

19                    MR. BRUTON:  Nothing to add, Your

20   Honor.

21              We appreciate you taking the time to

22   preside.

23          WHEREUPON,

24       at 12:55 o'clock p.m. the hearing was adjourned.

25

D&M Land Company, LLC        Hearing Transcript                    1/5/2010

Page 83

CERTIFICATION

I, Jodi L. Howard, Notary Public in and for the County of Randolph, State of North Carolina at Large, do hereby certify;

That the hearing in the matter hereon captioned was duly recorded by me, reduced to typewriting under my supervision and the foregoing consecutively numbered pages are a complete and accurate record of said hearing;

That I am the Official Court Reporter for matters in the Court hereon captioned and that the transcript herein transcribed is the Official Record of same;

That the undersigned is not of kin nor in anywise associated with any of the parties to said cause of action, nor any counsel thereto, and that I am not interested in the event(s) thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this the 8th day of February, 2010.

Jodi L. Howard

Official Court Reporter

Atlantic Professional Reporters

Post Office Box 11672

Winston-Salem, NC 27116-1672

Page 84

CERTIFICATE OF MAILING

I, Cassandra J. Stiles, CVR, do hereby certify that a true copy of the transcription of the matter hereon captioned was served on the party named below by the placement of said transcript copy in the United States Mail, Priority Mail delivery, with proper postage affixed, addressed as follows:


Kevin Sink, Esq.

NICHOLLS & CRAMPTON, P.A.

Post Office Box 18237

Raleigh, NC  27619



This the  9th  day of February, 2010.


_____

Cassandra J. Stiles, CVR